ESTHER LOITHERSTEIN, trustee, *vs.* INTERNATIONAL
BUSINESS MACHINES CORPORATION.

Suffolk.   November 14, 1980. — December 26, 1980.

Present: BROWN, GREANEY, & KASS, JJ.

*Landlord and Tenant,* Termination of lease.  *Option.*

Under the terms of a ten year lease which gave the tenant a unilateral op-
tion to terminate the lease at the end of five years upon conditions that
it give the lessor twelve months' prior written notice of its intention to
exercise the option and that the tenant pay the lessor a termination
charge at the time of termination, the option was not properly exer-
cised where the lessor did not receive payment of the termination
charge until six days after the termination date.  [93-96]

CIVIL ACTION commenced in the Superior Court on
March 4, 1977.

The case was heard by *Ford, J.,* on motions for summary
judgment.

*Raymond J. Brassard* for the defendant.

*Joel A. Kozol* for the plaintiff.

GREANEY, J.  This case raises the question whether a lease
executed between the plaintiff as trustee of 1505 Common-
wealth Trust (trust) and International Business Machines
Corporation (IBM) was properly terminated by IBM under
an "Early Termination Option" at the end of the fifth year
of its initial ten year term.  The lease, dated November 1,
1967 (as amended on December 14, 1967), provided that
IBM would lease the trust's land and buildings in Brighton
for a term commencing on December 14, 1967, and ending
on December 31, 1977, at an annual rent of $245,398.25
payable in monthly installments of $20,449.85.   IBM
subleased two small portions of the building and used the
balance for a distribution center.  Insofar as pertinent to

this appeal, the amended lease contained the following provisions:

> "22 [Early Termination Option]. Notwithstanding that the initial term hereof . . . is stated to be ten (10) years, the Tenant shall have the right to terminate this Lease at the end of the fifth year of the initial term hereof by giving at least twelve (12) months' prior written notice thereof to Landlord and upon the payment to Landlord of a termination charge in the amount of $27,237.20, which payment shall be made at the time of Lease termination."

> "2 [Lease Amendment and Agreement]. In the event the Building Lease is terminated 'at the end of the fifth year of the initial term' in accordance with the provisions of paragraph [22] thereof, the effective date of such termination shall be December 31, 1972."

The lease also provided that IBM's holding over after "expiration" of the term would create a month-to-month tenancy.

About December 8, 1971, IBM notified the trust that it was exercising its "option" under paragraph 22 to terminate at the end of the fifth year, effective December 31, 1972. This last date passed without the trust's receipt of the $27,237.20 termination charge. On January 5, 1973, the trust advised IBM that it considered the purported termination ineffectual because the specified payment had not been paid. IBM's check for the full amount arrived the next day.[1] The trust rejected the "belated tender," and notified IBM that it considered the lease in full force and effect. On

---

[1] Curiously, the check was dated December 5, 1972, and mailed in an envelope bearing a January 3, 1973, postage meter postmark. The envelope was addressed in handwriting and IBM's printed return address had been struck and replaced by a written New York City address. IBM took the position that the check had been mailed on or about December 5, and that it had inferably been mishandled by the Federal mail system.

February 28, 1973, IBM vacated and moved its distribution center to Newton. This lawsuit followed.

On cross motions for summary judgment (Mass.R.Civ.P. 56[a],[b], 365 Mass. 824 [1974]), raising essentially the facts just outlined, partial judgment on liability was entered for the trust (rule 56 [c]), based on a special master's finding that IBM had failed seasonably to exercise its option rights. A single justice of this court authorized an interlocutory appeal by IBM from that judgment. *Foreign Auto Import, Inc.* v. *Renault Northeast, Inc.,* 367 Mass. 464, 470 (1975). *Mansfield* v. *GAF Corp.,* 5 Mass. App. Ct. 551, 552 (1977).

A lease for a term of years may properly be made subject to termination at a specified time, upon the occurrence of an event or events within the control of the party electing to terminate. See *Owen* v. *Field,* 102 Mass. 90, 104 (1869); *Shaw* v. *Farnsworth,* 108 Mass. 357, 360 (1871); *Harrison* v. *Jordan,* 194 Mass. 496 (1907); *Papanastos* v. *Heller,* 227 Mass. 74, 76 (1917); *Berman* v. *Rowell,* 274 Mass. 260, 266-267 (1931); *Markey* v. *Smith,* 301 Mass. 64, 68-70 (1938). See also 1 American Law of Property § 3.89 (Casner ed. 1952); Schwartz, Lease Drafting in Massachusetts § 5.6, at 113 n.12 (1961); Annot., Option of One Party to Terminate Lease, 137 A.L.R. 362, 386-391 (1942). Such a provision creates a conditional limitation on the leasehold estate. 1 Tiffany, Real Property § 148 (3d ed. 1939). An option to terminate by a tenant for years may operate as a conditional limitation. *Id.* See *Markey* v. *Smith, supra* at 69; *Indian Ref. Co.* v. *Roberts,* 97 Ind. App. 615, 634 (1933). When the conditions in the option are fulfilled, "the lease is determined by its own limitation, without any entry or other act to be done by the lessor."[2] *Wheeler* v. *Dascomb,* 3 Cush. 285, 288 (1849). See *First Universalist Soc.* v. *Boland,* 155 Mass. 171, 174 (1892); *Markey* v. *Smith, supra* at 69.

---

[2] In conveyancing, a limitation is distinguished from a condition subsequent. The latter has been "generally held to be for the benefit of the lessor or his assigns, and [to] confer upon him or them an option whether to enter upon breach of condition or to allow the lessee to continue in possession under the lease." *Markey* v. *Smith, supra* at 70, and cases cited.

Apparently, when this lease was executed in 1967, IBM foresaw that business conditions might call for the distribution center's relocation to another site. Based on that prospect, IBM negotiated for, and obtained, the right to terminate the lease at the end of the fifth year. The termination provision created a conditional limitation on the leasehold estate; a right which was unilateral in nature, exclusively for IBM's benefit, and thus to be strictly construed. Cf. *Torrey* v. *Adams*, 254 Mass. 22, 25-26 (1925); *Lucey* v. *Hero Intl. Corp.*, 361 Mass. 569, 573-574 (1972); *Westinghouse Bdcst. Co.* v. *New England Patriots Football Club, Inc.*, 10 Mass. 70, 73-74 (1980); *United States* v. *T. W. Corder, Inc.*, 208 F.2d 411, 413 (9th Cir. 1953). We view the clause (as did three judges below) as necessitating for its proper exercise IBM's timely fulfilment of two conditions: (1) notice by December 31, 1971, that IBM intended to terminate the lease (which was done), and (2) payment by December 31, 1972, of a liquidated sum (which was not done). We reach this conclusion from: the paragraph's use of the word "and" to connect both conditions to the option's exercise, the fact that the "right to terminate" is expressly predicated "upon the payment . . . of a termination charge [as specified] . . . at the time of [the] lease termination," the fact that the "effective date of such termination *shall be December 31, 1972*" (emphasis supplied), and the absence of any provision governing the parties' rights if payment was not made by that date.

We also believe that holding the possessor of a unilateral right of this sort to literal compliance with the requirements for its exercise enforces commercial certainty. The particular language for the option was carefully chosen by sophisticated parties and is not dependent for its explication or effect on any other provisions of the lease. Void of subtleties, it "must be enforced according to its terms." *Sherman* v. *Employers' Liab. Assur. Corp.*, 343 Mass. 354, 356 (1961), and cases cited. The provision cannot be judicially rewritten to cure an oversight or to relieve IBM from the effect of an unforeseen contingency. See *Van Dusen Aircraft*

*Supplies of New England, Inc.* v. *Massachusetts Port Authy.*, 361 Mass. 131, 142-143 (1972); *Kostick* v. *Dupree*, 10 Mass. App. Ct. 929 (1980). The option to terminate was not properly exercised. See *Pope* v. *Abbott*, 211 Mass. 582, 583 (1912); *Hunt* v. *Bassett*, 269 Mass. 298, 302 (1929); *Hurd* v. *Cormier*, 358 Mass. 736, 738 (1971).

IBM asks us to distinguish between notice of an option's exercise and performance of the obligations incurred as a result of that exercise. It contends that the rights of the parties were fixed in 1971 when notice of termination was given and that payment of the termination charge could be made anytime, presumably even after IBM had vacated. We do not think that the paragraph is susceptible to this construction. In our view, the case is governed by those precedents and authorities which state that "time is of the essence of an option" (*Hurd* v. *Cormier*, 358 Mass. 736, 738 [1971], and cases cited), and which hold that an option calling for notice and payment requires timely compliance with both conditions for its proper exercise.[3] See *Donovan Motor Car Co.* v. *Niles*, 246 Mass. 106, 107 (1923); *American Oil Co.* v. *Katsikas*, 1 Mass. App. Ct. 437, 439 (1973); *Epton* v. *CBC Corp.*, 48 Ill. App.2d 274, 280-287 (1964); 1 Williston, Contracts § 61D, at 206 (3d ed. 1957); 1 Corbin, Contracts § 273, at 597 (1963). As was recently stated in an analogous case with a canvass of relevant authorities: "In the circumstances it may not be too much to ask that a person seeking . . . to exercise [unilateral] option rights turn his corners squarely." *Westinghouse Bdcst. Co.* v. *New England Patriots Football Club, Inc.*, *supra* at 73.

---

[3] The statement in one of the defendant's affidavits that the trust was seeking a new tenant or tenants for the building during 1972 does not by itself tend to show that the trust regarded the option to have been effectively exercised. The trust has always taken the position that the option was not properly exercised. Between December 8, 1971, and December 31, 1972, the trustee could have believed that IBM would make the payment on time and that prudence required a preliminary search for a new tenant. There is no assertion that the trust executed a lease with a third party prior to December 31, 1972. After that date, it would have been incumbent on the trust actively to seek a new tenant to mitigate damages.

IBM also argues that the facts should be given an equitable construction to avoid a "forfeiture." A party who stumbles in exercising an option is generally not entitled to equitable relief. See *Hunt* v. *Bassett, supra* at 302-303; *Hildreth* v. *Adams*, 229 Mass. 581, 583-584 (1918) (holding the lessee to an additional term "should he fail to give the required notice or, giving the notice, should [he] neglect to vacate the premises at the expiration of the lease"); *Eno Syss., Inc.* v. *Eno*, 311 Mass. 334, 338 (1942). See also 1 American Law of Property § 3.86, at 368 (Casner ed. 1952). The option existed for IBM's benefit to relieve it of what might become "an onerous and unprofitable obligation." *Owen* v. *Field*, 102 Mass. 90, 105 (1869). Enforcement of the lease because of IBM's misstep will not impose "an arbitrary penalty or forfeiture; nor . . . will [it] give the plaintiff 'a grossly disproportionate compensation for the defendant's failure to [properly terminate] . . .'." *Hildreth* v. *Adams, supra* at 584.

It follows that the lease remained in force after December 31, 1972, and that the provisions of the holdover clause do not apply. The ruling in the Superior Court to this effect was correct. The case is to stand in that court for assessment of damages.

*Judgment affirmed.*