M X L INDUSTRIES, INC., Plaintiff and Counterdefendant-Appellant, v. BERNARD MULDER, Defendant and Counterplaintiff-Appellee.

Second District   No. 2—93—0008

Opinion filed November 4, 1993.

Roger A. Ritzman and Linda A. Haviland, both of Peregrine, Stime, Newman, Ritzman & Bruckner, Ltd., of Wheaton, for appellant.

Arthur G. Jaros, Jr., of Richter & Jaros, and Jerome A. Tatar, of Jerome A. Tatar & Associates, P.C., both of Oak Brook, for appellee.

JUSTICE DOYLE delivered the opinion of the court:

Plaintiff, M X L Industries, Inc., filed an action for declaratory judgment against defendant, Bernard H. Mulder, in the circuit court of Du Page County, seeking a determination that it satisfied its obligations, as a tenant, under an early termination provision of a commercial building lease. Defendant counterclaimed seeking damages for accrued rent arrearages and physical damage to the building. Plaintiff timely appeals from various orders of the circuit court which collectively held in substance (1) that plaintiff did not properly terminate its lease obligation with defendant; (2) that defendant was entitled to $211,230.64 in unpaid rent, interest, and post-verdict statutory interest; and (3) that defendant was entitled under the terms of the lease to $67,277.11 in attorney fees and costs.

Plaintiff raises the following issues on appeal: (1) whether it substantially performed the obligations necessary for early termination of the lease; (2) whether it settled the sole condition precedent to terminating the lease; (3) whether defendant waived any objection to plaintiff's tender; and (4) whether there was sufficient evidence in the record to support the conclusion that defendant made a reasonable attempt to mitigate his damages.

Plaintiff (tenant) and defendant (landlord) entered into a five-year commercial real estate lease, commencing March 1, 1987, for approximately 9,000 square feet of industrial space located in Clarendon Hills, Illinois. Section 2 of the lease provided for plaintiff to pay

defendant $3,000 per month during the first year of occupancy and $3,600 per month during the remaining years. Section 3 required a $3,000 security deposit. Section 7(b) required plaintiff to maintain the premises in good repair, normal wear and tear excepted. Additionally, the lease contained the following early termination provision:

"(a) The term of this Lease shall be for a period of five (5) years commencing on the 1st day of March, 1987 and ending on the 29th day of February, 1992 (hereinafter referred to as 'the term of this Lease'). Notwithstanding the foregoing provisions of this Subsection 1 (a), at any time after the 29th day of February, 1988, Lessee may terminate this Lease by paying to Lessor all sums then due pursuant to the provisions of this Lease and an additional sum equal to four (4) months' rent specified in Section 2 hereof. If Lessee exercises such right, the term of this Lease shall end on the date on which Lessor receives such payment from Lessor [sic]."

Approximately one year following the inception of the lease, plaintiff, in a letter dated February 24, 1988, notified defendant of its intention to exercise its rights under the early termination provision. The letter stated that plaintiff "has vacated the premises as of February 26, 1988," that all accrued rent through February 1988 was paid, and that the net proceeds due under the lease terms would be available on the 29th of February. According to plaintiff's letter, the amount purportedly due defendant was $11,400, which represented four months' rent ($14,400) less the security deposit ($3,000). The correspondence further provided that "under the circumstances *** it was imperative that a release of the Lease be executed by each of the parties upon payment of the amounts due" to defendant.

The release agreement provided that in consideration of payment of the release fee the parties agreed to release and discharge one another from all further rights and obligations with respect to the lease, including plaintiff's obligation to pay rent. The agreement provided for a certified check in the amount of $11,400 plus a release of the security deposit ($3,000), thus equaling four months' rent at the rate commencing March 1, 1988. Following the transmittal of the February 24 letter and release, and prior to February 29, 1988, plaintiff deposited with its attorney, John Mulherin, the sum of $11,400.

Defendant testified that upon his receipt of the February 24 letter he contacted Frank Yohe, an MXL vice-president, and explained that MXL owed him March rent and that he would be sending a punch list of physical discrepancies. Mulherin testified that he received a phone call from defendant, wherein defendant expressed his concerns about

the condition of the premises and advised Mulherin that he was sending a list of discrepancies. Defendant further testified that he advised Mulherin of MXL's obligation for March rent.

On or about March 3, defendant transmitted to plaintiff a list of maintenance discrepancies which he considered plaintiff responsible for under the terms of the lease. Mulherin subsequently notified defendant, by letter dated March 15, 1988, that it was his understanding that plaintiff completed all of the items on the discrepancy list. Defendant testified that he contacted Mulherin to inform him that the contemplated repair work had not been completed. Defendant proposed that plaintiff pay defendant $3,000, and he would have his personnel complete the repair work.

Following their conversation, Mulherin wrote defendant and informed him that he wanted it made perfectly clear that his client, plaintiff, was no longer in possession of the premises and that it would not assume any liability for possession of the premises. Defendant testified that at the time he made the $3,000 offer he noted that there was a deficiency in the amount of the settlement because it did not include March rent. According to defendant, in order to resolve the matter, he required four months' rent, March rent, and compensation for damage to the building. Defendant also testified that he and Mulherin had conversations regarding items of property he believed MXL left on the premises, specifically, a scrap metal dumpster, a camper, and a boat and trailer. Joseph Richenberger, a tow truck operator, testified that on March 1, 1988, he removed a cooling tower from the roof of the building at the request of Woodland Tool.

Defendant further testified that, on or about March 21, and "in order to make this thing go," he proposed a reduction in the settlement amount to $2,000. According to his testimony, defendant, at that point, wanted four months' rent, March rent, and $2,000 for damage to the building. Defendant further stated that he told Mulherin that it was getting near the end of the month, and if the matter was not resolved, MXL would owe rent for April. Mulherin testified that following defendant's initial mention of rent, defendant never mentioned it again to him.

Mulherin subsequently informed defendant, by letter dated March 25, 1988, that plaintiff had accepted defendant's proposal to pay the additional $2,000 in consideration of the full settlement and release of the lease. The letter further stated that upon receipt of the signed release agreement from defendant, which was attached to the letter, Mulherin would forward a check or wire transfer in the amount of $13,400 ($11,400 plus the additional $2,000) to any bank or individual

at defendant's direction. The release agreement attached to the March 25 letter was similar in substance to the agreement attached to Mulherin's February 24 letter, with the exception that the subsequent agreement purported that plaintiff exercised its option to terminate by notice given to defendant "on as of the first day of March, 1988 [*sic*]." Defendant testified that he was surprised when he received the release and the letter because it was not in accord with the proposal he had given to Mulherin.

In a subsequent correspondence, dated April 7, 1988, from Mulherin to defendant, Mulherin expressed his surprise at having learned from defendant's wife that defendant had increased his demand by an additional $3,600. Mulherin further stated that in spite of the fact that "we have previously tendered all of the funds due you to terminate the lease we have now elected to go one step further and enclose the following two checks in payment." The first check was in the amount of $11,400, and the second was for $2,000. On the reverse side of the first check, the following notation appeared:

> "Payment of the proceeds of this instrument (including the application of the $3,000 security deposit by Lessor) constitute[s] full payment due Lessor, *** to terminate the Lease pursuant to notice of Lessee, MXL Industries, Inc., dated Feb. 24, 1988, and so terminates the lease effective on midnight Feb. 29, 1988."

The second check bore a similar notation which purported to release plaintiff from any and all claims for alleged damages to the premises arising from plaintiff's tenancy. Defendant did not cash the checks, and, upon agreement of counsel for both parties, the checks were placed in an interest-bearing account.

By letter dated May 12, 1988, defense counsel informed Mulherin that the checks totaling $13,400 were inadequate to discharge plaintiff's obligations under the lease. Defendant took the position that plaintiff's obligations under the lease did not terminate until the date he received the four-month cancellation sum plus all other sums due under the lease, and plaintiff had not physically vacated the premises until the end of March. Defendant calculated, as of the date of the letter, that plaintiff was in arrears for March, April, and May rent; physical damages; and four-month cancellation, thus totaling $24,400.

Plaintiff subsequently filed a complaint against defendant seeking a declaration that it performed its obligations under the terms of the lease. Defendant counterclaimed for amounts he alleged were still owed by plaintiff under the terms of the lease. Defendant prayed for an additional $2,000, "as the agreed upon liquidated sum for unreme-

died items," $3,600 per month as and for rent commencing with March 1988, and for each month thereafter, and attorney fees as provided for in the lease. Both parties moved for summary judgment.

On April 26, 1989, the trial court denied plaintiff's motion for summary judgment in its entirety and granted, in part, defendant's motion. The trial court found that plaintiff did not comply with the early termination provisions because it failed to tender the full amount due in accordance with the lease; that notice provided by plaintiff did not terminate the lease because plaintiff failed to satisfy all obligations, which was a condition precedent to early termination; that plaintiff was liable for March rent; and that plaintiff's insistence that a release be executed was not in conformity with the lease, and thus was an improper attempt to modify the terms of lease. The court further found that issues of fact remained regarding allegations of waiver, estoppel, plaintiff's failure to vacate the premises by February 29, 1988, and whether defendant received funds tendered to him by plaintiff.

Subsequent to the trial court's ruling on the parties' cross-motions for summary judgment, plaintiff raised three affirmative defenses to defendant's counterclaim. Plaintiff asserted that (1) the maximum recoverable amount was four months' rent as liquidated damages; (2) that defendant was equitably estopped from claiming damages in excess of four months' rent; and (3) that defendant failed to mitigate his damages. The trial court subsequently struck plaintiff's first and third affirmative defenses. The court's apparent basis for striking plaintiff's third affirmative defense, as gleaned from defendant's motion, was that mitigation of damages was not properly characterized as an affirmative defense, and, while the issue of liability on the lease remained pending in part, the question of mitigation of damages would nevertheless be premature. This interpretation is further supported by Judge Lewis' order that was entered following trial, wherein he set an additional hearing, after having ruled that plaintiff did not terminate its obligations under the lease, on the limited issue of mitigation of damages.

At trial, the court granted defendant's motion for a directed verdict relating to plaintiff's affirmative defenses of novation and account stated as alleged in plaintiff's second affirmative defense, and the court took the remaining matters under advisement. By letter dated April 11, 1991, the trial court ruled that, after considering all the evidence presented at the February 25, 1991, trial, it found the evidence consistent with defendant's position that the lease was not terminated and that a further hearing on the issue of mitigation was

in order. The facts relevant to mitigation are set out with our discussion of that issue. Following the hearing on mitigation, the trial court entered an award of damages in favor of defendant in the amount of $211,230.64, plus $67,277.11 for attorney fees.

Plaintiff first contends that it "substantially performed" the obligations of the lease termination provision, and, therefore, it would be inequitable to allow defendant to recover rents equal to the entire remaining term plus damages for repairs. Plaintiff argues that the four months' rent less the security deposit was tendered to defendant in conformance with the lease termination provision; that the funds were available to defendant as of February 29, 1988; that a second tender of funds occurred on March 25, 1988, following a settlement agreement between the parties; and that checks totaling $13,400 were sent to defendant on April 7, 1988. Defendant responds that plaintiff did not substantially perform the terms of the lease cancellation provision and, even if plaintiff had substantially performed, substantial performance is the incorrect legal standard to be applied. Before reaching plaintiff's initial contention, we must first consider, as a threshold consideration, whether the doctrine of substantial performance is applicable to an early cancellation provision in a lease for a term of years.

Illinois courts define a condition precedent as one which must be performed either before a contract becomes effective or which is to be performed by one party to an existing contract before the other party is obligated to perform. (*Cencula v. Keller* (1989), 180 Ill. App. 3d 645, 655.) The satisfaction of a condition is generally subject to the rule of strict compliance. (E. Farnsworth, Farnsworth on Contracts §8.3, at 353 (1990).) Professor Williston explains, " '[s]ince an express condition ... depends for its validity on the manifested intention of the parties, it has the same sanctity as the promise itself. Though the court may regret the harshness of such a condition, as it may regret the harshness of a promise, it must, nevertheless, generally enforce the will of the parties ....' " (E. Farnsworth, Farnsworth on Contracts §8.3, at 353 (1990), quoting 5 S. Williston, Contracts §669 (3d ed. 1961).) A party seeking the benefit of a condition precedent, however, may waive strict compliance by conduct indicating that strict compliance with the provision will not be required. *Community Convalescent Center v. First Interstate Mortgage Co.* (1989), 181 Ill. App. 3d 996, 1000.

Distinctly different, although analogous to the concept of a condition, are constructive conditions of exchange. The concept of constructive conditions of exchange was developed by the courts in

order to allow the court to supply terms under which a party's duties to perform are conditioned on the performance to be given in return. (E. Farnsworth, Farnsworth on Contracts §8.1, at 343 (1990).) The purpose of constructive conditions of exchange is to play an integral role in assuring the parties to a bilateral contract that they will actually receive the performance that they have been promised. (E. Farnsworth, Farnsworth on Contracts §8.9, at 401 (1990).) A common application of the concept occurs when one party seeks to justify its own refusal to perform on the ground that the other party has committed a breach of the contract. In sum, the doctrine serves the salutary purpose of assuring each party to a bilateral contract that it will receive the promised return performance, and it expresses a judicial preference for dependent promises. E. Farnsworth, Farnsworth on Contracts §8.9, at 401 (1990).

█ Because constructive conditions of exchange invoked the concept that one party's duty to perform was conditioned on the other party's performance, the need arose to ameliorate the rule of strict compliance ordinarily applied to express conditions. As explained by Professor Farnsworth, "[t]he doctrine evolved that if one party's performance is a constructive condition of the other party's duty, only 'substantial' performance is required of the first party before that party can recover under the contract." (E. Farnsworth, Farnsworth on Contracts §8.12, at 415 (1990).) Farnsworth further notes, however, that "[t]his flexible requirement of substantial performance stands in sharp contrast to the requirement of strict compliance that protects a party that has taken the precaution of making its duty expressly conditional." (E. Farnsworth, Farnsworth on Contracts §8.12, at 415 (1990).) Stated differently, the doctrine does not address substantial performance of a condition; rather, it focuses on substantial performance by one party of its obligations arising out of an agreed exchange of performances. (*Brown-Marx Associates, Ltd. v. Emigrant Savings Bank* (11th Cir. 1983), 703 F.2d 1361, 1367 (doctrine inapplicable to minimum required rental provision in loan commitment).) Accordingly, an express condition precedent, unless otherwise excused, operates by agreement of the parties to define the satisfaction of a necessary antecedent to a party's performance under the contract and is subject to the rule of strict compliance, unless such compliance is waived. In contrast, constructive or implied conditions of exchange operate to regulate the parties' course of performance and are subject to the rule of substantial performance.

Typically, an option to cancel a lease is conditioned on a tenant's advance notice to the landlord of its intention to cancel and the pay-

ment of a premium ordinarily consisting of rent for a specified period. (M. Friedman, Friedman on Leases § 21.1, at 1187 (3d ed. 1990).) The cancellation provision in the present case was silent on the issue of notice. It does establish the time for exercise of the option, which is generally recognized as being subject to the rules governing contractual conditions, including the rules that relate to waiver. (See E. Farnsworth, Farnsworth on Contracts § 8.7, at 388 (1990).) The option language further required plaintiff to pay a premium equal to four months' rent and "all sums then due."

Cases from other jurisdictions suggest that the doctrine of substantial performance is inapplicable to an option to terminate. In *Satin v. Buckley* (D.C. 1968), 246 A.2d 778, an early termination clause provided that tenant could terminate his lease upon 30 days' notice if he were transferred to another location by his employer, the Peace Corps. The court held that the tenant did not effect a valid termination of the lease because the termination clause could not be interpreted to include a transfer resulting from the tenant's new employment with a different governmental agency. 246 A.2d at 780.

In *Loitherstein v. International Machines Corp.* (1980), 11 Mass. App. Ct. 91, 413 N.E.2d 1146, the court held that a tenant's failure to exercise seasonably its option to cancel a lease for a term of years would be ineffective to terminate its obligations. The court reasoned that because the termination provision created a conditional limitation on the lease, which was negotiated for by tenant and created a unilateral right exclusively for its benefit, the provision was to be strictly construed. The court was further persuaded by the fact that the provision was negotiated by the parties and the option language was carefully chosen by sophisticated parties.

Although no Illinois court has directly held that a tenant's unilateral right to exercise an option to terminate in a lease for a term of years is subject to the rule of literal or strict compliance, at least two courts in Illinois have expressed the general rule that options to terminate must be construed in accordance with the agreement and the option *must* be exercised in the manner provided in the lease. (See *Cox v. Grant* (1978), 57 Ill. App. 3d 922, 925; *Associated Cotton Shops, Inc. v. Evergreen Park Shopping Plaza of Delaware, Inc.* (1960), 27 Ill. App. 2d 467, 473-74.) The rule is consistent with the broader notion that the exercise of an option is ineffective where the purported exercise of it varies in any way the terms of the option agreement. See *Dodds v. Giachini* (1979), 79 Ill. App. 3d 358, 361 *rev'd on other grounds* (1981), 84 Ill. 2d 284.

■ Based upon the foregoing, we conclude that the doctrine of substantial performance has no application to the present option to cancel a commercial lease for a term of years. Because plaintiff's argument necessarily concedes that it did not literally or strictly comply with the option requirements, we must conclude that the option was not effectively exercised. While we recognize that a rule of strict compliance might lead to harsh results, such a rule tends to "enforce[ ] commercial certainty." (See *Loitherstein*, 11 Mass. App. Ct. at 94, 413 N.E.2d at 1149.) Moreover, the parties here are sophisticated business people, the right to cancel was for the plaintiff's sole benefit, and there was no evidence in the record to suggest that the option language resulted from overreaching or an unfair inequality in bargaining power. Finally, we note further that the record does not support the conclusion that defendant waived the requirement of strict compliance.

Plaintiff further contends, however, that the parties settled the sole condition precedent to terminating the lease, which was the cost to repair physical damages to the building. Defendant responds that there was sufficient evidence at trial to support the conclusion that the settlement referred only to physical damage to the building and not "all sums then due." Defendant argues, in part, that the lease could not have been terminated because March rent was still owing and that payment for repair costs had not been paid.

■ Initially, we reject defendant's argument that because the termination clause provided that tenant could only terminate after February 29, 1988, the parties intended an initial term of 13 months prior to the cancellation right becoming exercisable. In *Public Relations Board, Inc. v. United Van Lines, Inc.* (1978), 57 Ill. App. 3d 832, the court construed a substantially similar termination provision in an agreement for public relations and sales promotional services. The termination clause provided that the agreement could be "cancelled by either party with 60 days advance notice any time after December 31, 1975." The defendant notified the plaintiff 75 days prior to December 31 that it was cancelling the agreement. The plaintiff rejected the defendant's notice, contending that the earliest possible termination was February 29, 1976, 60 days after December 31, 1975. Interpreting the parties' intentions from the unambiguous language of the termination clause, the court rejected plaintiff's contention. Finding that the agreement provided for an annual retainer fee payable in equal monthly installments, the court concluded that plaintiff's interpretation would have the effect of converting an agreement initially intended to last for 12 months into one for 14 months, which was not

consistent with the parties' intentions. *Public Relations*, 57 Ill. App. 3d at 834.

Where the language of a contract is unambiguous, the intention of the parties must be ascertained by the language utilized and not by the construction placed upon it by the parties. (*Szczerbaniuk v. Memorial Hospital* (1989), 180 Ill. App. 3d 706, 713.) Moreover, a court cannot construe the contract contrary to the plain and obvious meaning of the language (*Johnstowne Centre Partnership v. Chin* (1983), 99 Ill. 2d 284, 287; *Szczerbaniuk*, 180 Ill. App. 3d at 713), and it is presumed that the terms and conditions are purposefully inserted and that the language is not idly employed. (*Szczerbaniuk*, 180 Ill. App. 3d at 713.) Analogous to the cancellation provision in *Public Relations*, the agreement in the present case contemplated payments allocated in accordance with an annual fee schedule payable in equal monthly installments. Accordingly, we reject defendant's interpretation that the initial period prior to the termination right being exercisable was 13 months, thus including March rent.

Defendant further argues that even if the termination provision were interpreted as contemplating an initial period of 12 months instead of 13 months, there was sufficient evidence that plaintiff remained in possession of the premises after February 29, 1988. Plaintiff does not dispute that a cooling tower it owned was still on the premises on March 1, 1988, when it was removed. Plaintiff further admitted, in its answer to a request to admit facts, that it left items of personal property on the premises after February 28, 1988. Accordingly, there was sufficient evidence to support a conclusion by the trial court that plaintiff remained in possession of the premises during the month of March, thus entitling defendant to rent for March. Because of our conclusion, it is unnecessary to reach defendant's further argument that it was entitled to March rent because the amount for physical damage to the building remained in dispute during the month of March.

■ Plaintiff next contends that defendant waived any objection to its tender of funds to Mulherin on February 24, 1988. Plaintiff argues that because defendant, at the time of the February 24 letter, objected only to the condition of the property and voiced no demand for March rent, defendant waived any objections to plaintiff's tender of the funds. Although the term is susceptible to varying definition, and absent a controlling statutory definition, the common law defines "tender" as an unconditional offer of payment consisting of the actual production of a sum not less than the amount due on a particular obligation. (74 Am. Jur. 2d *Tender* §1, at 545-46 (1974).) It is widely rec-

ognized that a tender must be without conditions to which the creditor can have a valid objection or which will be prejudicial to his rights. (74 Am. Jur. 2d *Tender* §24, at 561-62 (1974).) Additionally, tender of an amount less than the creditor claims is due is ineffective when acceptance is conditioned on an admission that no greater amount is due. (74 Am. Jur. 2d *Tender* §25, at 562-63 (1974).) Thus, where a debtor conditions its tender with a demand for a full release, absent an express stipulation in the contract or statutory requirement obliging the creditor to give a prior release, the tender is ineffective. 74 Am. Jur. 2d *Tender* §25, at 563 (1974).

In his February 24 letter to defendant, Mulherin explicitly stated that "it was imperative that a release of the Lease be executed by each of the parties upon payment of the amounts due." The express language of the contract does not provide for the provision of a release. The release agreement provided that in consideration of the "release fee" the parties agreed to release and discharge one another from all further rights and obligations. At the time of the letter and plaintiff's purported tender, however, the question of "all sums then due" remained open. Accordingly, plaintiff's offer of four months' rent less the security deposit in conjunction with the release would have relieved plaintiff of its obligation to pay defendant any additional sums that it might have owed under the terms of the cancellation provision. Plaintiff's purported tender, therefore, was conditioned on defendant's admission that no greater amount was due under the terms of the early cancellation provision, thus rendering the tender ineffective.

■ Plaintiff finally contends, presumably in the alternative, that defendant failed to mitigate his damages. Plaintiff initially argues that defendant's efforts to market the property were not reasonable. Defendant responds that his duty to mitigate did not require that he undertake optimal measures to ensure success; rather, the only requirement was that he take reasonable actions.

On appeal, a reviewing court will not disturb the trier of fact's determination of damages unless it is contrary to the manifest weight of the evidence. (*Northwest Commerce Bank v. Continental Data Forms, Inc.* (1992), 233 Ill. App. 3d 124, 127; *M B C, Inc. v. Space Center Minnesota, Inc.* (1988), 177 Ill. App. 3d 226, 234.) A reviewing court will not interfere with the trier's findings as to damages, even though it would have been satisfied with different findings, where the evidence is conflicting or where there is evidence in support of the verdict and there is no indication that the award was the result of passion, prejudice, or corruption. *Northwest,* 233 Ill. App. 3d at 127.

Section 9—213.1 of the Illinois Code of Civil Procedure provides: "§9—213.1. Duty of Landlord to mitigate damages. After January 1, 1984, a landlord or his or her agent shall take reasonable measures to mitigate the damages recoverable against a defaulting lessee." (735 ILCS 5/9—213.1 (West 1992).) The statute requires landlords to undertake reasonable efforts to relet the premises following a defaulting tenant's departure from the premises, rather than allowing the premises to stand vacant and collect rent in the form of damages. (*J M B Properties Urban Co. v. Paolucci* (1992), 237 Ill. App. 3d 563, 568.) In one of the few decisions to interpret section 9—213, one Federal district court has held that it is a question of fact whether a landlord's attempts to relet the premises at higher rental rates were reasonable efforts to mitigate. *American National Bank & Trust Co. v. Hoyne Industries, Inc.* (N.D. Ill. 1990), 738 F. Supp. 297, 302.

Based upon our review of the record, we find no basis upon which to disturb the trial court's award of damages. The evidence presented at the mitigation hearing revealed that defendant offered to relet the premises at a rental rate of $3,600 to $4,000, which was at or near the same monthly rate charged to plaintiff, and defendant was able to obtain some partial short-term rentals, albeit at a reduced rate. Defendant's expert testified that the asking price was a reasonable rate for the mitigation period. He further opined, based upon a hypothetical question which paralleled defendant's testimony about his efforts to relet the premises, that defendant's approach to marketing the property was reasonable.

Defendant also testified that as soon as plaintiff vacated the premises he engaged a building manager, erected a sign and began placing calls to bankers, real estate brokers, and developers. Defendant also initially ran newspaper advertisements in a local newspaper and occasional advertisements in regional newspapers. Additionally, plaintiff's own expert admitted that placing advertisements and erecting signage were reasonable steps toward reletting the premises.

Plaintiff does not dispute defendant's efforts to relet the premises; instead, his argument focuses on the "inadequacy" and unreasonableness of defendant's efforts. We interpret the underlying thrust of plaintiff's argument as essentially a request to have this court perform the trier's function and redetermine the reasonableness of defendant's efforts. It is not the duty of this court to invade the province of the trier of fact and substitute our judgment for that of the trier, where the trier's determination is otherwise supported by sufficient evidence in the record. We find ample support for the trial

court's conclusion that defendant took reasonable measures to mitigate his damages. Moreover, we do not find any suggestion in the record to support the conclusion that the award was the result of passion, prejudice, or corruption.

Plaintiff further argues that defendant's failure to have the building inspected for fire code violations and to remedy any discrepancies noted thereon further demonstrated defendant's failure to take reasonable efforts to mitigate his damages. Plaintiff cites no authority in support of its argument. Moreover, as noted by defendant, there was no evidence presented to support the conclusion that defendant could not have otherwise rented the premises or immediately remedied any discrepancies prior to a new tenant taking possession. Accordingly, we find this argument without merit.

■ Finally, defendant requests, in the event of affirmance, that this court remand the cause to the trial court for the sole purpose of determining appellate attorney fees. Provisions in contracts for awards of attorney fees are an exception to the general rule that the unsuccessful party is not responsible for payment of such fees. (*Abdul-Karim v. First Federal Savings & Loan Association* (1984), 101 Ill. 2d 400, 411-12.) Section 16(d) of the lease provides for the payment of attorney fees by plaintiff in the event defendant is made a party to *any litigation* commenced by plaintiff and also to pay all costs and reasonable fees incurred by defendant in enforcing the covenants of the lease. Accordingly, in light of our disposition of the preceding issues, we remand this cause to the trial court for a determination of reasonable appellate attorney fees.

For the foregoing reasons, we affirm the judgment of the circuit court of Du Page County and remand with directions.

Affirmed and remanded with directions.

INGLIS, P.J., and COLWELL, J., concur.