2025 IL App (2d) 240577-U
No. 2-24-0577
Order filed February 24, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| DANIEL MATURO and MICHAEL WHITE, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 23-MR-255 |
| | ) | |
| CF EAGLE BROOK ARCIS, LLC, | ) | |
| d/b/a Eagle Brook Country Club, | ) | Honorable |
| | ) | Kevin T. Busch, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Schostok and Kennedy concurred in the judgment.

**ORDER**

¶ 1   *Held*: The trial court did not err in denying defendant's motion to compel arbitration. The arbitration agreement did not apply to the two plaintiffs because (1) one plaintiff did not receive proper notice as Eagle Brook failed to comply with the modification clause included in the 2010 Rules and Regulations; and (2) the other plaintiff terminated his club membership nine years prior to the addition of the arbitration agreement. Affirmed.

¶ 2   Plaintiff-Appellees, White and Maturo[1], filed a lawsuit against Defendant-Appellant, CF Eagle Brook Arcis, LLC (hereinafter, "Eagle Brook") seeking

---

[1] White and Maturo filed their lawsuit individually and on behalf of all others similarly situated.

reimbursement of initiation deposits they paid to join the country club. Eagle Brook subsequently filed a motion to compel arbitration pursuant to an arbitration clause added to its Membership Plan in August 2022. Eagle Brook now appeals the trial court's denial of that motion. For the following reasons, we affirm.

¶ 3                                   I. BACKGROUND

¶ 4      In 1992, both plaintiffs, White and Maturo, joined Eagle Brook, a country club located in Geneva, Illinois. At the time, it was owned by Joseph Keim Enterprises, Inc. and Genevafield Ventures. Cost of membership was $18,500, to be paid in two installments: one installment in the amount of $9,250 to be paid "within ten days after the date of the written notice that [the] Application for Membership Privileges [was] approved" and one installment in the amount of $9,250 to be paid "within ten days after the date of written notice that the certificate of occupancy [had] been issued for the clubhouse." Both White and Maturo remitted the initial $9,250 to Genevafield Ventures.

¶ 5      The 1992 Membership Plan indicated that "[u]pon the resignation of membership privileges, the Club will repay to the member, within thirty days of the reissuance of the membership, seventy-five percent of the membership fee previously paid by the resigning member ***." The 1992 Membership Plan also included a modification provision:

> "The Club reserves the right, from time to time, to modify the terms and
>
> conditions of this Membership Plan, terminate this Membership Plan or terminate
>
> any or all memberships in the Club. The Club may also discontinue operation of

---

At the time of this appeal, the lawsuit has not been certified as a class action. See *Weiss v. Waterhouse Securities, inc.*, 208 Ill. 2d 439 (before certification, no suit is a class action; it is only an individual action).

any or all of the Club Facilities, sell or otherwise dispose of the Club Facilities or convert the Club into an equity member-owned club."

¶ 6    In June 1995, the Walters Group purchased Eagle Brook. White and Maturo were provided with a new Membership Plan; Rules and Regulations; Dues, Fees, and Charges Schedule; and a Membership Conversion Agreement. In order to continue their membership, they were required to execute the Membership Conversion Agreement and return it no later than June 28, 1995. Both White and Maturo did so. The Membership Conversion Agreement indicated that the remaining balance owed was the second payment installment of $9,250 (the "Deferred Amount"), which was to be paid "within fifteen (15) days after the date of the letter notifying the undersigned member that construction of Phase II of the clubhouse has commenced." White and Maturo both eventually remitted this second payment, though the record is not clear as to when those payments occurred. The Membership Conversion Agreement further indicated that should the agreement be signed, "the Prior Plan will be terminated and no longer in effect and all membership privileges issued pursuant to the Prior Plan will be null and void." Rather, the privileges pursuant to the 1995 Membership Plan would thereafter apply. Regarding the reimbursement of the membership fees or initiation deposit, the Membership Conversion Agreement read as follows:

"Upon payment of the Deferred Amount, the Successor Owner hereby agrees to repay the Deferred Amount, without interest, to the undersigned member or their heirs on the thirty (30) year anniversary date on which the member paid the Deferred Amount, unless repaid earlier as described below. In the event the undersigned member resigns Full Golf Membership privileges prior to expiration of the thirty (30) year period and the Deferred Amount has been paid, then the Successor Owner shall pay to the undersigned member a 'Transfer Payment' equal

to (i) 75% of the sum of the Amount Previously Paid and the Deferred Amount or (ii) 75% of the initiation deposit then charged by the Successor Owner for a Full Golf Membership, whichever is less. *** In the event the Transfer Amount is less than the Deferred Amount, the Club shall repay the difference upon expiration of the thirty (30) year period."

¶ 7　　The 1995 Membership Plan contained a different provision regarding the reimbursement of the membership fees or initiation deposit:

"The Club is unconditionally obligated to repay to the Club Member or their heirs one hundred percent (100%) of the initiation deposit actually paid for any category of membership offered by the Club, without interest, thirty (30) years from the date of acceptance. The Club's obligation to repay the initiation deposit to the Club Member is set forth in the member's Application for Membership Privileges. No initiation deposit will be refunded to a Club Member prior to the expiration of the thirty (30) year period unless specifically provided herein."

It also contained the following modification provision:

"The Club reserves the right, in its sole and absolute discretion, to modify the terms of this Membership Plan, to terminate this Membership Plan or terminate any particular membership in the Club with or without cause or terminate all memberships, to discontinue operation of any or all of the Club Facilities or to sell or otherwise dispose of the Club Facilities, or to convert the Club into a membership-owned club"

¶ 8     The 1995 Rules and Regulations contained a modification provision as well: "The Club reserves the right to amend or modify these rules when necessary and will notify the membership of any change."

¶ 9     In 1998, American Golf Country Clubs purchased Eagle Brook. It also amended the Rules and Regulations. Of note, the 1998 Rules and Regulations contained the following modification provisions: "Amendments to the Rules may be announced either by publication in the Club's newsletter or by posting at the Club. The Rules as amended or supplemented will be maintained in the Manager's office and are available for review upon request[,]" and "[t]hese Rules may be modified, amended, changed, altered or repealed at any time at Club Management's sole discretion, and may be supplemented by the publication of appropriate information in the Club's newsletter or by posting at the Club." A "Receipt of Rules and Regulations" form was provided to members, requiring a signature confirming the 1998 Rules and Regulations had been received, read, and understood.

¶ 10    In 2007, CNL Income Partners, L.P. purchased Eagle Brook. The Rule and Regulations were again amended on August 1, 2010. Relevant to this appeal, Section 1.4 and 12.8 were amended. Section 1.4 was amended as follows: "Members agree to be bound by these Rules as presently enacted or hereafter amended. Amendments to the Rules may be announced either by publication in the Club's newsletter or by posting at the Club." Section 12.8 was amended as follows:

> "Each membership incorporates these Rules. The membership application form signed by each Member and these Rules, as presently enacted or hereafter amended, constitute the entire agreement between each Member and Club Management. These Rules may be modified, amended, changed, altered, or

repealed at any time at Club Management's sole discretion, and may be supplemented by the publication of appropriate information in the Club's newsletter or by posting at the Club."

¶ 11    In September 2013, White resigned from Eagle Brook. The following year, Defendant-Appellant purchased Eagle Brook. On August 24, 2022, they amended the Membership Plan. Most relevant to this appeal was the addition of sections 10.3 through 10.5, which describe a three-step mandatory dispute resolution procedure to be followed in the event of any controversy, dispute, or claim regarding, resulting from, arising out of, or in any way related to Eagle Brook. The first step required the Member to notify Eagle Brook in writing of the claim and meet in person to discuss. Should the dispute not be resolved within 30 days of delivery of the written notice, the second step required the matter be submitted to mediation. Finally, if mediation failed, the matter was to be submitted to binding arbitration. The arbitration clause reads as follows:

"Should mediation not be successful in resolving any Dispute, then the Claimant who delivered the Dispute Notice shall have ninety (90) calendar days after the date of termination of the mediation to submit the Dispute to binding arbitration. If timely submitted, such Dispute shall be resolved by binding arbitration in accordance with the Commercial Arbitration Rules (as modified hereby), of the American Arbitration Association (but not its auspices), pursuant to this Section 10.5. If the Claimant fails to timely submit the claim to arbitration within the ninety (90) calendar day period, then the Dispute of the Claimant shall be deemed waived and abandoned and all applicable parties shall be relieved and released from any and all liability relating to the Dispute. A Claimant with any Dispute may only submit such Dispute in arbitration on such Claimant's own

behalf. No Claimant may submit a Dispute in arbitration as a representative or member of a class and no Dispute may be arbitrated as a class action. All parties and any Claimant submitting a Claim Notice (collectively, the "Bound Parties") agree that all Disputes that are not resolved by negotiation or mediation shall be resolved exclusively by arbitration conducted in accordance with this Section 10.5, and waive the right to have the Dispute resolved by a court, including the right to file or participate in a legal action as the representative or member of a class or in any other representative capacity. The parties shall cooperate in good faith to attempt to cause all necessary and appropriate parties to be included in the arbitration proceeding. Except as provided in this Section 10.5, the arbitrator shall have the authority to try all issues, whether of fact or law. The arbitration shall be conducted at the Club Facilities or such other place as agreed to by the parties."

Eagle Brook gave notice of these amendments by posting to its website prior to the date they would go into effect.

¶ 12    Also in August 2022, both White and Maturo requested reimbursement of 100% of their initiation deposit, or $18,500, as 2022 marked 30 years since they had joined the club in 1992. Eagle Brook denied that this amount was owed, and regardless, it would not become due until 2025, 30 years after the Membership Conversion Agreement was signed.

¶ 13    Negotiations between White and Maturo and Eagle Brook were apparently fruitless. White and Maturo filed their initial class action complaint against Eagle Brook on August 25, 2023. Eagle Brook subsequently filed a motion to compel arbitration on January 10, 2024. The matter commenced to hearing on that motion on April 5, 2024. The trial court dismissed the complaint without prejudice, as it found the claims were not yet ripe, as the 30-year time frame began running

when the Membership Conversion Agreements were signed in 1995. White and Maturo were granted leave to file an amended complaint by no later than May 15, 2024.

¶ 14     During the pendency of the initial proceedings, Maturo resigned from Eagle Brook at the "end of season 2023."

¶ 15     White and Maturo filed their first amended class action complaint on May 14, 2024. In it, they seek a declaratory judgment declaring the rights and obligations of the parties under the Membership Conversion Agreement and the 1995 Membership Plan, pursuant to 735 ILCS 5/2-701 *et. seq.* They further allege that Eagle Brook breached the contract they had with White and Maturo by failing to reimburse them 100% for their initiation deposit.

¶ 16     On June 13, 2024, Eagle Brook filed a motion to compel arbitration, arguing that the 2022 Membership Plan included a valid arbitration agreement that White and Maturo were bound by. Eagle Brook also requested that the trial court stay the proceedings pending arbitration. After further briefing on the motion, the matter proceeded to hearing on September 5, 2024.

¶ 17     The trial court ultimately denied Eagle Brook's motion:

> "Mr. White was operating under the rules and regulations in place on August 1st, 2010. The rules and regulations adopted in August -- on August 1st, 2010, did not contain an alternative dispute resolution clause.
>
> * * *
>
> Mr. White terminated his membership and as such was no longer subject to any future amendments to the membership plan or rules and regulations, and, therefore, could not ever have become subject to an alternative dispute resolution clause.
>
> So, obviously the club had the absolute right to amend its agreement.

The 1995 membership plan on Page 15 under section K, Acknowledgment of Membership Rights, had the following clause, Modification and Termination of Membership Plan: The club reserves the right in its sole and absolute discretion to modify the terms of this membership plan, to terminate this membership plan, or terminate any particular membership in the club with or without cause or terminate all memberships in the club, to discontinue operation of any or all of the club facilities, to sell or otherwise dispose of the club facilities, or to convert the club into a membership-owned club.

This provision did not have any language indicating that it could be modified without notice, nor did it have any provision that hinted at notice of a certain type but clearly gave the club the right to modify.

It would be -- it would not be inappropriate for the Court to read into the agreement some form of obligation to provide notice. As I said, the agreement did not excuse -- specifically excuse notice, and since it did not specifically excuse notice, any unilateral right to modify an agreement must have some form of notice to those subject to.

The 1998 amendment clause essentially incorporated the exact same language.

Then in 2010, the language changed, I believe it's the third sentence that changed.

These rules may be modified, amended, changed, altered, or repealed at any time at club management's sole discretion and may be supplemented by the

publication of appropriate information in the club's newsletter or by posting at the club.

Defense has argued that the use of the word 'may' modifies the requirement of posting. That is a tortured reading of both contract law and this paragraph and sentence.

It is clear, given the fact that modification of an agreement must require some form of notice, that the insertion of this clause as it is a whole sentence: These rules may be modified, changed, altered, or repealed at any time at the club's management's sole discretion and may be supplemented. That's the key phrase.

We're not -- we're not supplementing your information. We're supplementing the rules and regulations. They can only be supplemented with the changes by notice that must be given either in the club's newsletter or by posting at the club. The club's website is not a posting at the club, nor was it, apparently the newsletter as the defense has essentially conceded that actual notice was not provided and that they are relying on constructive notice based on the fact that they agreed that all that they did was insert the amendments into the plan on the club's website without providing any notice -- actual notice to the parties that this had occurred.

And this isn't as important because any alternative dispute resolution provision, while they may be favored by courts and parties, an alternative dispute resolution process necessarily waives a very valuable and important right, which is the right to sue to air your grievances in a court of law.

The requirement of notice is necessary so that an individual has the option of opting out if they do not want to be subject to an alternative dispute resolution. It would have required them to terminate their membership, surely, because the right to amend was absolute.

But the right to inflict and impose terms on the membership is not. That required notice. That's the due process that is required for someone to give up such a valuable right. Any other interpretation would be unconscionable.

So the motion as it relates to enforced arbitration is denied."

¶ 18    Eagle Brook filed a timely notice of appeal on September 30, 2024. On October 10, 2024, the trial court entered an order staying the proceedings pending the outcome of this appeal.

¶ 19                                II. ANALYSIS

¶ 20    At issue in this appeal is whether the trial court properly denied Eagle Brook's motion to compel arbitration. Eagle Brook argues that the trial court erred for the following reasons: (1) both federal and state law favors enforcement of arbitration agreements; (2) Eagle Brook's 2022 Membership Plan includes an agreement to arbitrate; (3) Maturo is subject to the arbitration agreement as Eagle Brook provided proper notice of the modification adding the arbitration agreement; and (4) the arbitration agreement applies to White because he seeks to assert a claim under the membership plan. Eagle Brook also argues that any issues of enforceability should be decided by an arbitrator. Plaintiffs respond by arguing: (1) Maturo is not subject to the arbitration agreement as he did not receive proper notice; (2) White is not subject to the arbitration agreement as he terminated his membership in 2013; (3) the default resolution provision (hereinafter "DRP") is unconscionable; and (4) the Federal Arbitration Act (hereinafter "FAA") does not apply. For the following reasons, we agree with plaintiffs and affirm the trial court's order.

¶ 21    Both parties agree that this court should apply a *de novo* standard of review but disagree as to the reasons why. Eagle Brook cites to *Zuniga v. Major Leage Baseball*, 2021 IL App (1st) 201264, and contends that because the trial court did not conduct an evidentiary hearing or make any findings of fact, *de novo* review should be employed. Plaintiffs disagree, stating that while the trial court did not hear live testimony, it did consider evidence and make findings of fact. They cite to *Watkins v. Mellen*, 2016 IL App (3d) 140570, and *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446, to argue that review should be *de novo* as this court has the same documentary record the trial court utilized. We agree with plaintiffs. As in *Addison Insurance Co.*, the trial court here made factual findings based upon the exact record that is before us. *Addison Insurance Co.*, 232 Ill. 2d at 453. Accordingly, our review is *de novo*.

¶ 22    As Eagle Brook correctly notes, both federal and state law favor enforcement of arbitration agreements. *Brown v. Delfre*, 2012 IL App (2d) 111086, ¶ 14. However, an agreement to arbitrate is ultimately a matter of contract, and courts cannot require parties to arbitrate where they did not agree to do so. *Clanton v. Oakbrook Healthcare Centre, Ltd.*, 2023 IL 129067, ¶ 20. The question of whether parties to a dispute have contractually agreed to submit that dispute to arbitration is determined according to principles of state contract law. *Zuniga v. Major Leage Baseball*, 2021 IL App (1st) 201264, ¶ 14 (citing *Bess v. DirecTV, Inc.*, 381 Ill. App. 3d 229. 234). Here, it is undisputed that the 2022 Membership Plan included an arbitration agreement (see *supra* ¶ 11). However, we must determine whether Maturo and White are subject to said agreement, such that the trial court erred in denying Eagle Brook's motion to compel arbitration.

¶ 23    Turning first to Maturo—Eagle Brook argues that Maturo is subject to the arbitration agreement, as proper notice of the modification was provided. Maturo argues that notice was insufficient because the 2010 Rules and Regulations, which were in effect at the time Eagle Brook

added the arbitration clause, required notice of any amendments to be made by publication in the Club's newsletter or by posting at the Club (see *supra* ¶ 10). For the following reasons, we agree with Maturo.

¶ 24    Eagle Brook cites to several cases to argue that notice was sufficient, as clear and conspicuous notice of amended contracts by publishing them on a website provides sufficient notice under Illinois law. See *Wilson v. Redbox Automated Retail,* LLC, 448 F. Supp. 3d 873, 882; *Wilcosky v. Amazon.com, Inc.*, 517 F. Supp. 3d 751, 766-67; *Domer v. Menard, Inc.*, 2023 U.S. Dist. LEXIS 129715, at *10. However, in so doing, Eagle Brook ignores the existence of the modification clauses in the 2010 Rules and Regulations. Our analysis requires us to look to the contract between Maturo and Eagle Brook. More specifically, the modification clause in the 2010 Rules and Regulations. Our primary objective in construing a contract is to ascertain and give effect to the intent of the parties as expressed in the written agreement. *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446, 455. Unambiguous contract terms must be afforded their plain and ordinary meaning. *Brown*, 2012 IL App (2d) 111086, ¶ 19.

¶ 25    Here, there are two provisions in the contract between the parties that govern how the contract may be supplemented. The 2010 Rules and Regulations provide that they may be supplemented by publication in the Club's newsletter or by posting at the Club. (see *supra* ¶ 10). The trial court held that that Maturo did not receive proper notice and therefore could not be bound by the arbitration agreement because (1) the contract required a specific form of notice be given to supplement it; and (2) Eagle Brook failed to comply with that notice requirement. Eagle Brook argues that the trial court erred in this holding, as "may" is a permissive term. The provisions from the 2010 Rules and Regulations, therefore, authorized, but did not require Eagle Brook to use its newsletter or physical postings to provide notice. While we agree that "may" is indeed a permissive

term, here, the word "may" is immediately followed by the term "be supplemented." This means that the parties were permitted to supplement the rules. The remaining language, "by the publication of appropriate information in the Club's newsletter or by posting at the Club," defines how the permissive supplementation may occur. This is a closed set for a reason. To interpret the contract to mean that supplementation can occur with any sort of notice would render the inclusion of the two specific methods of supplementation meaningless. "A court will not interpret a contract in a manner that would nullify or render provisions meaningless[.]" *Thompson v. Gordon*, 241 Ill. 2d 428, 442.

¶ 26    Eagle Brook compares the instant case to *Professional Executive Center v. LaSalle National Bank*, 211 Ill. App. 3d 368. In *Professional Executive Center*, an easement agreement stated that where an occupant failed to maintain its portion of the land, any other occupant "may send written notice of such failure to the Defaulting party. Such notice shall contain an itemized statement…" *Pro Exec. Ctr.*, 211 Ill. App. 3d at 372. The plaintiff only gave oral notice to the defaulting party, which the trial court found to be insufficient. *Id.* at 375. The trial court refused to order defendant to specifically perform on the contract. *Id.* The appellate court reversed, finding that the term "may" was a permissive term, and the trial court erred in finding the written notice requirement mandatory. *Id.* at 379. In other words, the oral notice was sufficient as there was no mandatory written notice requirement. This case is distinguishable. Here, the term "may" is not immediately followed by methods of notice, as in *Professional Executive Center*. Rather, the term "may" is immediately followed by the term "be supplemented." So, Eagle Brook was permitted to supplement the rules, but not mandated to.

¶ 27    We also reject Eagle Brook's contention that posting notice on its website constituted posting at the Club, as required by the 2010 Rules and Regulations. Eagle Brook has not provided

citation to any authority to support this, so accordingly, they have forfeited this argument. See Ill. Sup. Ct. R. 341(h)(7); *Bayview Loan Servicing, LLC v. Starks,* 2022 IL App (2d) 210056, ¶ 16. Further, to interpret the provision as Eagle Brook proposes would require us to impermissibly deviate from the plain language of the contract and insert language into it. *MDX Industries, Inc. v. Mulder*, 252 Ill. App. 3d 18, 29. We decline to do so.

¶ 28     In their reply brief, Eagle Brook cites to *Miracle-Pond v. Shutterfly, Inc.*, 2020 U.S. Dist. LEXIS 86083, to support the contention that "[courts] have upheld a contract amendment's enforceability where the notice was posted on the company's website, and the parties had previously agreed that the amending party had the right to unilaterally modify the contract with or without notice."[2] However, the key in *Miracle-Pond* was that the change-in-terms provision at issue allowed for unilateral change without notice (other than posting the modified terms on their website, which they did). *Id.* at *14. Further, the Shutterfly terms of use contained language indicating that continued use of the app constituted acceptance of any changes. *Id.* The plaintiff in *Miracle-Pond* continued to use the app after Shutterfly changed the terms of use and properly posted the changes. *Id.* Thus, the contract was properly modified, plaintiff accepted those changes, and the arbitration clause was therefore enforceable. *Id.* Here, the modification clause that was in effect when Eagle Brook attempted to add the arbitration clause required notice, in one of two forms, which they did not comply with. Therefore, *Miracle-Pond* is distinguishable. For all the reasons discussed above, we hold that Eagle Brook did not provide proper notice to Maturo and therefore, he is not bound by the arbitration agreement.

---

[2] This was the contention made in Eagle Brook's reply brief. However, at oral argument, it seemed as though they were arguing that *Miracle-Pond* held that *no* notice was required.

¶ 29 Turning now to White. Eagle Brook argues that White is subject to the arbitration agreement, despite having resigned nine years prior to the arbitration agreement being added, because White seeks to assert a claim under the membership plan. Eagle Brook attempts to distinguish *Kinkel v. Cingular Wireless*, 223 Ill. 2d 1 (2006), by arguing that Kinkel had paid an early termination fee, had no ongoing contractual relationship with Cingular, and did not make any claims under her contract with Cingular. We disagree with this distinction.

¶ 30 In *Kinkel*, Kinkel paid an early-termination fee in order to end her "service term" with Cingular early. *Kinkel*, 223 Ill. 2d at 5. She filed suit, individually and on behalf of a similarly situated class, against Cingular, alleging that the early-termination fee constituted an illegal penalty. *Id.* at 4-5. While the lawsuit was pending, Cingular modified the arbitration clause to include a class action waiver, and attempted to have the trial court apply the most current version to plaintiff. *Id.* at 9. Cingular filed a motion to compel arbitration pursuant to the mandatory arbitration provision of the service agreement, which the trial court denied on the basis of unconscionability. *Id.* at 5-6. The appellate court concluded that the class action waiver was unconscionable, but that it was severable from the remainder of the arbitration clause. *Id.* at 6. It remanded the case for further proceedings, noting that Kinkel's individual lawsuit would be stayed while her class claim proceeded to arbitration. *Id.*

¶ 31 Relevant to our analysis, the Supreme Court held that the original arbitration clause, rather than the modified arbitration clause, should be applied to Kinkel because Cingular did not have the right to unilaterally modify the terms of a contract that had been terminated many months prior to the attempted modification. *Id.* at 14. As the *Kinkel* court succinctly notes: "One party to a contract may not unilaterally modify a contract term—whether it is an arbitration clause, a disclaimer of incidental and consequential damages, a liquidated damages clause, or any other

term—after the contractual relationship between the parties has ended and the original contract is the subject of a dispute." *Id.* at 14-15. That is the exact situation here. Eagle Brook is attempting to unilaterally modify the contract terms between itself and White after the contractual relationship had ended and the original contract between Eagle Brook and White is the subject of the dispute.

¶ 32    Eagle Brook argues that there still exists a contractual relationship between itself and White because " 'the right and privilege' White complains about has not yet vested" and he therefore remains under contract with Eagle Brook. However, Eagle Brook does not cite to any authority to support this contention. Arguments that are unsupported by citations to relevant authority are considered forfeited. See Ill. Sup. Ct. R. 341(h)(7); *Bayview Loan Servicing, LLC v. Starks,* 2022 IL App (2d) 210056, ¶ 16. Regardless, as a general rule, rights which accrued or vested under a contract remain enforceable after the termination of the contract. *Matthews v. Chicago Transit Authority*, 2016 IL 117638, ¶ 82. Black's Law Dictionary defines "vested" as "[h]aving become a completed, consummated right for present or future enjoyment; not contingent; unconditional; absolute." Black's Law Dictionary (10th ed. 2014). The right at issue was Eagle Brook's *unconditional* obligation to repay the initiation deposit actually paid for, 30 years from the date of acceptance (see *supra* ¶ 7). As their obligation to repay was unconditional, it would be considered a vested right and therefore remain enforceable after the termination of the contract.

¶ 33    Eagle Brook further attempts to argue that White is subject to the arbitration clause by comparing the instant case to *Southport Bank v. Miles*, 2014 U.S. Dist. LEXIS 41547 (N.D. Ill. Mar. 27, 2014). Eagle Brook specifically argues that the *Southport Bank* court upheld the unilateral modification agreement because it found no evidence that the contractual relationship between the parties had ended at the time of the modification. However, the instant case is easily distinguishable. The record is replete with evidence that the contractual relationship between

White and Eagle Brook had ended at the time the contract was modified to add the arbitration agreement. Accordingly, we reject this argument, and hold that White was not subject to the arbitration agreement.

¶ 34　As we have determined that the arbitration agreement does not apply to Maturo and White, we need not address Eagle Brook's final argument, that an arbitrator should decide any issues of enforceability.

¶ 35　　　　　　　　　　　　　　III. CONCLUSION

¶ 36　For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 37　Affirmed.