NATIONAL MEDICAL CARE, INC. & another[1] *vs.*
SHELDON ZIGELBAUM.

Suffolk.     January 12, 1984. — September 26, 1984.

Present: GREANEY, C.J., KASS, & WARNER, JJ.

*Contract,* Employment, Option, Termination, Damages. *Estoppel. Damages,* Termination of employment contract.

Under an employment contract providing for termination by the employer "upon the payment to the Employee of an amount equal to six months' salary . . . , such amount to be paid in full on the termination date," a notice of termination without payment of the termination compensation was ineffective. [575-576]

A clause in an employment contract providing that the employer may terminate the contract upon payment of six months' compensation to the employee was not affected by a subsequent memorandum of agreement between the employer and a corporation formed by the employee providing that the employer and the corporation would each pay half of the employee's compensation, and, thus, when the employer gave notice of termination to the employee, the corporation was not responsible for the payment of the employee's termination compensation. [576-578]

In an action for breach of an employment contract the judge erred in concluding that the employee was estopped from claiming certain damages, where the defense of estoppel had not been pleaded and had not been raised during trial or in the posttrial submissions of the parties, and where, in any event, the essential elements of the defense of estoppel had not been established. [578-581]

Where the judge in an action for breach of an employment contract had made no finding as to the amount of the employee's damages as a result of the illegal termination of his employment, and the record on appeal did not contain sufficient information for calculation of damages, the case was remanded to the trial court for a determination of damages and any other necessary proceedings. [581-582]

CIVIL ACTION commenced in the Superior Court on August 6, 1976.

---

[1] Human Resource Institute, Inc.

The case was heard by *Lynch, J.*

*Richard M. Zinner* (*Kristine A. Doherty* with him) for the defendant.

*Paul F. Saba* for the plaintiff.

WARNER, J. On this appeal after a bench trial in the Superior Court, the following facts, gleaned from the documentary evidence and the judge's findings of fact, are undisputed. Under a written agreement dated January 1, 1971, between National Medical Care, Inc. (NMC), and Human Resource Institute, Inc. (HRI) (a wholly owned subsidiary of NMC), providers of health care services, and the defendant, a psychiatrist, the defendant was employed to supervise a psychiatric services division operated by HRI. The original term of employment was to be for four and one-half years from January 1, 1971.

Paragraph 5 of the agreement provided in pertinent part: "In any event, this Agreement and the Employee's employment hereunder may be terminated by the Employer [HRI] . . . *without cause upon the payment to the Employee of an amount equal to six months' salary at his then salary rate, such amount to be paid in full on the termination date*" (emphasis supplied). The agreement further provided in paragraph 10: "This Agreement contains the entire agreement of the parties with respect to its subject matter and no waiver, modification or change of any of its provisions shall be valid unless in writing and signed by the parties against whom such claimed waiver, modification or change is sought to be enforced." NMC guaranteed all of the agreements and obligations of HRI.

In February, 1972, the defendant formed a professional corporation, named Community Mental Health Associates, Inc. (CMHA), of which he was the sole officer, director and stockholder. CMHA, however, had a corporate identity separate and distinct from the defendant. It was formed to provide physicians' services to HRI's Boston facility which had previously been secured directly by NMC and HRI. Prior to January 9, 1973, as a result of conversations about the fiscal relationship of CMHA and HRI's Boston facility, the president of NMC and the defendant agreed that CMHA would provide physicians' services to HRI's Boston facility; that HRI would advance

operating funds to CMHA; that the defendant's salary in 1973 would be $70,000, half of which would be paid by NMC and half by CMHA; and that because HRI would advance CMHA funds necessary to meet expenses, including the defendant's salary, NMC and HRI would, in effect, guarantee that the defendant would receive $70,000 as salary for 1973. The substance of these agreements, among other things, was contained in a memorandum of January 9, 1973, prepared by the defendant in concert with the president of HRI. It purported to describe a relationship "which began in April 1972, and will terminate December 31, 1974." On the subject of the defendant's salary the memorandum stated: "[S]alary for 1973 will be $70,000. $35,000 of this will be paid by NMC and $35,000 will be derived from CMHA. All previously maintained malpractice insurance, health and accident insurance, pension plan, life insurance, and other fringes will be maintained for [the defendant] at the same benefit levels which obtained in 1972. . . . The system as described for 1973 will remain in force for 1974." Both the president of NMC and the defendant accepted the fiscal arrangements as outlined in the agreements and memorandum. According to the memorandum, the books of CMHA would be available for audit by "HRI/NMC personnel on an ad lib basis."

On June 25, 1973, NMC sent a letter to the defendant informing him that the boards of directors of NMC and HRI had voted to terminate his employment as of June 30, 1973. The notice specifically referred to the termination without cause provisions of paragraph 5 of the employment contract of January 1, 1971. Further, the letter stated: "Pursuant to the existing arrangement between NMC and [CMHA] such sum of $35,000 [an amount equal to six months' salary at the current rate] will be paid to you from [CMHA] to the extent of available assets therefrom, and if funds are not sufficient, the balance by NMC. In addition, in accordance with said memorandum, we hereby request that an audit be made of the books of [CMHA] by our authorized financial representative." The references in the letter to "the existing arrangement" and the "memorandum" are to the January 9, 1973, memorandum from the defendant to NMC

and HRI. Another request for an audit of the books of CMHA was made by letter of July 10, 1973, which referred to the letter of June 25, 1973, to the defendant from NMC. Counsel for the defendant wrote on November 29, 1973, to counsel for NMC, stating in part: "Under Paragraph 5 of said Employment Contract [dated January 1, 1971], six months' salary, amounting to $35,000 was to be 'paid in full on the termination date.' Said amount was not paid in full on June 30, 1973, and, in fact, has not been paid to the date hereof. In view thereof, it seems to me that your client is liable not only for the $35,000, but for all salary and other benefits payable pursuant to said Employment Contract from July 1, 1973, to the date of delivery of said check in the amount of $35,000 — for all of which demand is hereby made." NMC's counsel responded by letter of December 21, 1973, that he believed the defendant had received about $27,000 of the termination payment and that the balance would be forthcoming upon completion of the audit of CMHA's books. The purpose of the audit, he said, was "to ascertain the amounts received by [the defendant] from [CMHA]. After the appropriate computations have been made, then we can provide for any remaining payments." An audit ensued over the following several months. In a letter of February 6, 1974, the representatives of NMC stated that the purpose of the audit was "on the understanding that the entire cash balance, as of July 31, 1973, of $20,890.68, together with all future collections from Patient Receivables, were left to [CMHA] to be used for the purpose of paying $35,000 to [the defendant.] Personal expenditures from corporate funds were charged to [the defendant] as a payment on account of the $35,000."[2] NMC's audit showed that the defendant owed $2,054.79 to NMC, but the defendant's accountant challenged the propriety of some of the charges; NMC's representative reaffirmed his conclusions. The dispute apparently ended for the time in a stalemate.

---

[2] The judge found that $3,500.54, which NMC claimed were the defendant's personal expenses, constituted legitimate corporate expenditures of CMHA.

The defendant's claims for termination compensation under the employment contract and for regular compensation, such as they were, lay dormant until NMC and HRI commenced this action on August 6, 1976, to compel the surrender by the defendant of fifty shares of HRI common stock repurchased by HRI under a stock purchase agreement. The defendant counterclaimed, seeking, in the alternative, the $35,000 termination payment called for in the employment contract or damages for lost salary and fringe benefits. Judgment was entered ordering the surrender of the stock[3] and, on the counterclaim, ordering NMC and HRI to pay to the defendant $35,000. The defendant's claims for lost salary and other benefits were dismissed. All parties have appealed.

In a detailed memorandum of decision the judge concluded that (1) the termination of the defendant's employment status was "entirely proper, with the exception of the failure to make [the termination] payment," (2) there was no "understanding" or "arrangement" that CMHA would pay all or any part of the termination payment, (3) the defendant was estopped, by his failure timely to assert illegal termination, from claiming loss of salary and fringe benefits for the term remaining under the employment contract, and (4) NMC and HRI had failed to make the required termination payment of $35,000 to the defendant. NMC and HRI challenge conclusions (2) and (4), and the defendant urges error in (1) and (3).

1. *Standard of review.* "We give due weight to the findings of the judge who has heard the testimony and who has had an opportunity to weigh the credibility of the witnesses. *Seder* v. *Gibbs,* 333 Mass. 445, 446 (1956). His findings of fact will not be set aside unless they are clearly erroneous. Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). However, '[i]nferences from the basic facts . . . are open for our decision, and the inferences drawn by the trial judge are entitled to no weight in this court.' *Malone* v. *Walsh,* 315 Mass. 484, 490 (1944). Further, as [was] held in *Colby* v. *Callahan,* 311 Mass. 727, 729 (1942), where a judge's ultimate findings are inconsistent with his subsidiary

---

[3] On appeal the defendant does not contest this part of the judgment.

findings, we shall set aside the ultimate findings. See *Reardon* v. *Reardon,* 345 Mass. 772, 772 (1963); *Atwood* v. *Atwood,* 297 Mass. 229, 231-232 (1937); *Wyness* v. *Crowley,* 292 Mass. 459, 460-461 (1935). We are not bound by the judge's conclusions of law. *Newburyport Soc'y for the Relief of Aged Women* v. *Noyes,* 287 Mass. 530, 532-533 (1934)." *Simon* v. *Weymouth Agricultural & Industrial Soc.,* 389 Mass. 146, 148-149 (1983).

2. *Termination of the defendant's employment.* The clause in the employment contract under which NMC[4] purported to terminate the defendant's employment provided: "In any event, this Agreement and the Employee's employment hereunder may be terminated by the Employer . . . *without cause upon the payment to the Employee of an amount equal to six months' salary at his then salary rate, such amount to be paid in full on the termination date*" (emphasis supplied). The June 25, 1973, letter advising the defendant of the termination of employment stated the effective date to be June 30, 1973. The construction of the termination clause is a question of law. *Freelander* v. *G. & K. Realty Corp.,* 357 Mass. 512, 516 (1970). The parties' protracted appellate skirmishes over what label should be attached to the right to terminate miss the point. It matters not what this unilateral right is called. The language of the termination clause is explicit. "When . . . the words [of a contract] are plain and free from ambiguity they must be construed in their usual and ordinary sense. . . . [The contract] must be enforced according to its terms." *Sherman* v. *Employer's Liab. Assur. Corp.,* 343 Mass. 354, 356 (1961). *Freelander* v. *G & K Realty Corp., supra. Larabee* v. *Potvin Lumber Co.,* 390 Mass. 636, 641 (1983). NMC and HRI would have us distort the plain language of the termination clause by interpreting it as giving them a right to terminate without cause by notice, accompanied by a separate promise to pay termination compensation at any time. We cannot rewrite the contract to

---

[4] The employment contract gives the right to terminate the defendant's employment to the entity described in the contract as the employer, HRI. The defendant does not argue that termination was ineffective because the notice was sent by NMC.

cure an oversight or relieve a party from the consequences of the failure to adhere to its plain terms. See *Van Dusen Aircraft Supplies, Inc.* v. *Massachusetts Port Authy.,* 361 Mass. 131, 142-143 (1972); *Loitherstein* v. *International Business Mach. Corp.,* 11 Mass. App. Ct. 91, 94 (1980). We agree with NMC and HRI that the clause gives them the "unfettered right" to terminate the defendant's employment. By its plain terms, however, the only effective act of termination would be the payment of termination compensation. To the extent that the judge's somewhat ambiguous conclusions may be read to the contrary, we set them aside. The notice of June 25, 1973, of intent to terminate on June 30, 1973, was, at best, a courtesy. The fundamental rationale of cases dealing with the exercise or nonexercise of options lends added force to our construction. See *Hurd* v. *Cormier,* 358 Mass. 736, 738 (1971), and cases cited; *Christian* v. *Giard,* 3 Mass. App. Ct. 770 (1975); *Roberts-Neustadter Furs, Inc.* v. *Simon,* 17 Mass. App. Ct. 262, 264-265, 269 (1983). See also 1A Corbin, Contracts § 264, at 522-523 (1963); 1 Williston, Contracts § 61D, at 206 (3d ed. 1957). Terms giving a unilateral right exclusively for the benefit of the holder have been and should be strictly construed. See *Westinghouse Bdcst. Co.* v. *New England Patriots Football Club, Inc.,* 10 Mass. App. Ct. 70, 73 (1980); *Loitherstein* v. *International Business Mach. Corp., supra* at 94-95. See also 6 Corbin, Contracts § 1266, at 65 (1962). This employment contract was made in no less of a commercial context than those involved in *Westinghouse* and *Loitherstein, supra.* The admonition of *Westinghouse, supra* at 73, that the holder of such a unilateral right "turn his corners squarely" is equally applicable here.

3. *The source of the termination payment.* It is not disputed that neither NMC nor HRI made direct payment at any time of $35,000 to the defendant. NMC and HRI claim, however, that the employment contract was amended by the January 9, 1973, memorandum from the defendant to the president of NMC so as to provide that, to the extent of available assets,

termination compensation would be paid by CMHA.[5] They contend that the parties' conduct subsequent to the January 9 memorandum confirmed the "understanding" that the employment contract had been so amended.

On the basis of documentary and oral evidence, the judge concluded that the January 9 memorandum did not effect an amendment of the employment contract with respect to termination compensation and that, prior to termination, the defendant did not agree to any such amendment.

The judge's findings and conclusions are fully supported by the record before us, which consists of the documentary evidence and designated portions of the transcript. The memorandum of January 9, 1973, by its terms did not amend the detailed employment contract, other than with respect to the salary of the defendant for 1973 and 1974. The term of the employment contract was to end on June 30, 1975. CMHA was created principally to facilitate payments by Blue Cross insurance for services rendered. As the judge found, and the parties agree, CMHA was not the "alter ego" of the defendant. The January 9 memorandum outlined, among other things, the fiscal relationship between CMHA and NMC and HRI, which included the advance of funds from HRI to CMHA for operating expenses and described a previous loan from HRI to CMHA. The provision for the audit of CMHA's books at any time was appropriate for use in monitoring the repayment obligations on the loan and advances.[6] It did not, as NMC and HRI argue, by any stretch of reasoning carry the necessary implication that CMHA became responsible for the payment of the defend-

---

[5] NMC and HRI further argue that their audit of CMHA showed that the defendant had received all or substantially all of his termination compensation from CMHA. In view of our disposition of the case it is unnecessary to reach this question.

[6] The judge found that as of June 30, 1973, CMHA had less than $20,000 in cash and that it then owed HRI $21,700. As of June 30, 1975, HRI wrote off this receivable but never advised the defendant or CMHA that the debt was due or that it had been written off. The judge properly concluded that NMC and HRI did not have the right unilaterally to set off CMHA's indebtedness against the termination payment.

ant's termination compensation. The judge's finding that the employment contract had not been amended outside of the memorandum had ample basis in the oral testimony, the credibility of which was for him to determine.[7]

4. *Estoppel:* The judge concluded that the defendant was estopped from claiming damages measured by the difference between his contract salary and fringe benefits for the original term of employment and his earnings and benefits during that period. He explained that his determination might have been different if the defendant had taken the position at the time of his purported termination that the failure of NMC and HRI to make timely payment of $35,000 rendered the employment termination legally ineffective. Beyond this and the comment that it would be a "gross injustice" to rule that NMC's and HRI's "misguided recourse" to CMHA as the source of termination payments should lead to the measure of damages which the defendant seeks, the judge did not articulate the basis upon which he found estoppel.

a. *The procedural setting.* At the threshold is the question of the availability to NMC and HRI of the affirmative defense of estoppel. The familiar black letter rule is that estoppel is one of the defenses which must be affirmatively pleaded or it is excluded from the case. Mass.R.Civ.P. 8(c), 365 Mass. 750 (1974). *Middlesex & Boston St. Ry.* v. *Aldermen of Newton,* 371 Mass. 849, 859 (1977). *Building Insp. of Lancaster* v. *Sanderson,* 372 Mass. 157, 162 (1977). See 5 Wright & Miller, Federal Practice and Procedure § 1278 (1969 & 1983 supp.). That doctrinaire approach is tempered by the pragmatic principles expressed in the rules of civil procedure and Federal cases which have addressed the subject. Even though estoppel is not affirmatively pleaded, if the issue is tried

---

[7] The judge also concluded that, if there had been any "understanding" or "arrangement" that all or any part of termination compensation would be paid by CMHA, it would be unenforceable because it was not in writing and signed by the defendant as explicitly required by paragraph 10 of the employment contract. But see *Staples Coal Co.* v. *Ucello,* 333 Mass. 464, 468 (1956); *Costonis* v. *Medford Housing Authy.,* 343 Mass. 108, 114 (1961); 3A Corbin, Contracts § 763 (1964).

by the express or implied consent of the parties and there is no prejudicial surprise, it is treated as if it had been raised in the pleadings without regard to whether the pleadings are amended to conform to the evidence. See Mass.R.Civ.P. 15(b), 365 Mass. 761 (1974); *Tillman* v. *National City Bank,* 118 F.2d 631, 635 (2d Cir. 1941); *Jakobsen* v. *Massachusetts Port Authy.,* 520 F.2d 810, 813-815 (1st Cir. 1975); *Mason* v. *Hunter,* 534 F.2d 822, 825 (8th Cir. 1976); *Jones* v. *Miles,* 656 F.2d 103, 107 (5th Cir. 1981); 2A Moore's, Federal Practice par. 8.27[3] (2d ed. 1984); 5 Wright & Miller, *supra.*

In this case, the record amply demonstrates that the judge's invocation of the doctrine of estoppel was a surprise to all parties. Indeed, NMC and HRI did not have the presence to move to amend their pleading pursuant to Mass.R.Civ.P. 15(b), as they could have even after judgment. It is undisputed that the defense of estoppel was not pleaded, that the issue was not raised in the posttrial submissions of the parties, and that no amendment to include the defense was sought. The parties did not focus on the question during the trial. The evidence which might be thought to be relevant came in on NMC's and HRI's contention, expressly raised in their answer to the counterclaim, that the employment contract had been amended so as to provide a different source of termination compensation. See *Jakobsen* v. *Massachusetts Port Authy., supra* at 813.

We do not imply that a judge after a bench trial may not base his decision on an obvious affirmative defense not pleaded or otherwise called to attention by a party but supported by the evidence. We hold simply that where the affirmative defense is not pleaded, where the parties do not at trial join issue on the matter and where the evidence does not show conduct "which is inherently wrongful or which is violative of some fundamental principle of public policy," *O'Donnell* v. *Bane,* 385 Mass. 114, 117 (1982), quoting from *Gleason* v. *Mann,* 312 Mass. 420, 422 (1942), the judge may not rest his decision on that defense without more. In such a case, the judge may reopen the trial to hear argument or to receive further evidence on a question which he perceives to be dispositive. Cf. Mass.R.Civ.P. 15(b).

b. *The merits.* We do not rest our disposition on the issue of estoppel solely on a procedural ground. "'The essential factors giving rise to an estoppel are . . . (1) A representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made. (2) An act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made. (3) Detriment to such person as a consequence of the act or omission.' *Greenwood* v. *Martins Bank, Ltd.* [1933] A.C. 51, 57." *Industrial Bankers* v. *Reid, Murdoch & Co.,* 297 Mass. 119, 124 (1937). See *Gamache* v. *Mayor of North Adams,* 17 Mass. App. Ct. 291, 294 (1983).

Fatal to the merits of the position of NMC and HRI is the absence in the record of any evidence (apparently because the parties did not address the issue), or permissible inference therefrom, that the defendant did anything to induce a course of conduct on the part of NMC and HRI with regard to the right to the damages which he now seeks.[8] The posture of NMC and HRI was unswerving throughout. They dealt only with the source of the termination payment. They insisted, beginning with the June 25, 1973, letter drafted by their counsel and ending with the accountants' sally, that the termination was proper and that the source of the termination payment should be CMHA. The response, by counsel for NMC and HRI, to the defendant's clear protest of November 29, 1973, through his counsel, that his employment contract had not been validly terminated and that he was entitled to the measure of damages which he now seeks, was to ignore it.

Further, there was no evidence that any representation or conduct of the defendant caused NMC and HRI to do anything different from what they otherwise would have done. See *Gamache* v. *Mayor of North Adams, supra.* Moreover, there

---

[8] The judge's uncontradicted findings show that NMC issued a duplicitous press release two days after the termination notice concerning the defendant's continued involvement with it and HRI and that it was clear that on or about June 25, 1973, the defendant was prohibited from providing any services to NMC or HRI.

was no showing that NMC and HRI had been harmed other than by the passage of time.[9]

5. *Damages.* The judge made no finding as to the amount of the defendant's damages as a result of illegal termination of his employment. "The measure of damages recoverable by an employee wrongfully discharged before the expiration of an employment contract is the wages he would have earned under the contract less what he did in fact earn or in the exercise of proper diligence might have earned in another employment." *Dickson* v. *Riverside Iron Works, Inc.,* 6 Mass. App. Ct. 53, 57 (1978). See *Maynard* v. *Royal Worcester Corset Co.,* 200 Mass. 1, 6 (1908); *McKenna* v. *Commissioner of Mental Health,* 347 Mass. 674, 677 (1964); *Huntoon* v. *Quincy,* 349 Mass. 9, 13 (1965); 11 Williston, Contracts § 1358, at 302 (3d ed. 1968); 5 Corbin, Contracts § 1095, at 516 (1964). The employee has a duty to use his time well after being discharged in an attempt to mitigate his damages. *Maynard* v. *Royal Worcester Corset Co., supra.* Corbin, *supra.* The burden of proving failure to mitigate damages, however, is on the employer. *McKenna* v. *Commissioner of Mental Health, supra. Black* v. *School Comm. of Malden,* 365 Mass. 197, 212 (1974), *S.C.* 369 Mass. 657 (1976). *Kaltsas* v. *Duralite Co.,* 4 Mass. App. Ct. 634, 639 (1976). Corbin, *supra* at 518.

The record before us does not include sufficient data from which to calculate the defendant's damages with certainty. See *Black* v. *School Comm. of Malden, supra* at 214. The most notable deficiency involves the calculation of the defendant's salary for the final six months — January 1, 1975, through June 30, 1975 — where resort must be had to the original employment contract formula. (The salary for 1973 and 1974 and the continuation of fringe benefits were fixed by the January 9, 1973, memorandum.) In addition, close attention should be given to whether, and to what extent, the defendant may recover for lost fringe benefits. See and compare *Dickson* v. *Riverside*

---

[9] The failure of NMC and HRI to collect the debt owed by CMHA seems to have been related to the source of payment question. The judge expressly ruled that NMC and HRI had no right to set off that debt against the termination payment. See note 6, *supra.*

*Iron Works, Inc.,* 6 Mass. App. Ct. 53, 58 (1978); *Maddaloni* v. *Western Mass. Bus Lines, Inc.,* 12 Mass. App. Ct. 236, 248-249 (1981), *S.C.* 386 Mass. 877, 884 (1982).

6. *Disposition.* Paragraphs 1 and 3 of the judgment are affirmed. Paragraph 2 is reversed. The case is remanded to the Superior Court for a determination of damages recoverable by the defendant consistent with this opinion, and for the entry of a new judgment on the defendant's counterclaim. The judge may hold such hearings and receive such further evidence as he may deem necessary.

*So ordered.*