Gershengorn, J.
Diamond Crystal Brands, Inc. brought this suit against Backleaf, LLC alleging a violation of Massachusetts General Laws c. 93A, §11 and seeking monetary damages for that violation and a declaratory judgment as to the charges owed by Diamond Crystal for electricity charges at the property leased by Diamond Crystal from Backleaf. Following a jury-waived trial before this Court, for the reasons set forth below, this Court determines that Diamond Crystal has not proven a violation of Chapter 93A and accordingly no monetary damages are awarded, and that the electricity charges to be paid by Diamond Crystal shall be not in excess of the full amounts of the electricity costs due for the entire building at the Wilmington property.
FINDINGS OF FACT
This Court has based its findings of fact on the credible evidence offered at trial and reasonable inferences drawn therefrom. In so doing, it found that Mr. Fiola’s testimony at trial was not credible due to the inconsistencies in his testimony and his convenient and self-serving lack of memory and sudden recall demonstrated throughout deposition testimony, direct and cross-examination. This Court has found credible the testimony of Mr. Gottesman and Attorney Levin.
Diamond Crystal is a corporation organized under the laws of the state of Delaware with its principal place ofbusiness in Savannah, Georgia. Backleaf, LLC is a limited liability company also organized under the laws of Delaware with its principal place of business in Wilmington, Massachusetts. In and around May 2000, Backleaf negotiated to purchase from Diamond Crystal Specialty Foods, Inc., a subsidiary of Diamond Crystal, a piece of property located at 10 Burlington Street in Wilmington, Massachusetts (“Wilmington property”) on which was located a building. At the same time, the parties negotiated a lease-back provision in which Diamond Crystal would lease from Backleaf a small portion of the property, approximately 16%, for its operations. From approximately November 1999 until the date of purchase (the “Diamond Crystal sole occupancy period”) Diamond Crystal was to be the sole occupant of the Wilmington property. Following that time, both Diamond Crystal and Backleaf would be occupying the building. The lease negotiated by the parties was a one-year written lease agreement with a one-year option to renew and was a “net lease,” under which Diamond Crystal was to pay a base rent amount and operating costs in addition to that amount. The operating costs included, inter alia, Diamond Crystal’s share of the cost of electricity to the building. Electricity metering at the building was done by means of a single meter, however, such that it was not possible to determine precisely the electricity used by Diamond Crystal when both Diamond Crystal and Backleaf were occupying the building. Although the parties ideally would have been able to break out Diamond Crystal’s electricity use from that of Backleaf s, because of the single meter, such a breakdown was not possible. The parties considered establishing a set amount for Diamond Crystal to pay for its electricity based on the square footage of the building it occupied, but such a charge would have undercharged Diamond Crystal for the time during which it was the sole occupant, and therefore the sole user of electricity, in the building. Following further negotiations, the parties agreed upon a provision in the contract which stated:
4(b) In addition to the base rent, the LESSEE shall pay, as “Additional Rent”:
(i) . . .
(ii) LESSEE’S share of electricity . . . charges attributable to LESSEE’S occupancy of the leased premises, said share to be based on the LESSEE’S historical costs of electricity . . . experienced by the LESSEE from the date manufacturing ceased at the building in or about November 1999 to the date of the purchase of the property by Lessor . . .
Rider “A” to Lease Between Diamond Crystal Brands, Inc. and Backleaf LLC dated September 5, 2000, at section 4(b)(ii) (“Section 4(b)(ii)”). The parties assumed that the total electric costs after Backleaf moved in would be greater than the electric costs during the Diamond Crystal’s sole occupancy period. The parties agreed to this language because they were unable to break out from the single meter calculation the precise amount of electricity cost due to Diamond Crystal’s operations. It was always the intent of the parties to charge Diamond Ciystal for the electricity actually useid by that company during the period of the lease and the intent of both parties was to find a method to *584 allocate the electricity charges equitably, based upon usage, between the parties.
During the ten-month Diamond Crystal sole occupancy period, the total electricity cost was $79,235, or $7,924 average per month. At the closing, Diamond Crystal paid $1,542.75 as electricity cost for the first month. The day after the closing Backleaf sent a letter to Diamond Crystal seeking $6,381.25, the difference between the monthly average of $7,924 and the payment made by Diamond Crystal of $1,542.75. When Diamond Crystal refused to pay the difference, Back-leaf served it with a Notice to Quit. Under protest, Diamond Crystal paid the difference. Although the parties subsequently discussed amending the lease to delete Section 4(b)(ii) and install a separate electrical meter or submeter to measure the electricity con: sumed by Diamond Crystal, that amendment was never adopted. Diamond Crystal claims that Backleaf refused the metering because Diamond Crystal said it was unlikely to exercise its option under the lease, so Backleaf decided to “extort as much money as possible from Diamond Crystal under the Lease Provision.” I find that Backleaf did threaten to terminate the lease if Diamond Crystal did not pay the amounts demanded. Diamond Crystal continued to refuse to pay $7,924 per month for the electricity. In November 2000, Backleaf informed Diamond Crystal that it considered that failure to be a default under the lease and served Diamond Crystal with a Notice of Default of the Lease. Diamond Crystal again paid the amounts demanded under protest. While I have found that the defendant never was entitled to the windfall it demanded I do not find its conduct amounted to bad faith or was otherwise a violation of c. 93A, §11.
The electricity cost during the ten-month Diamond Crystal sole occupancy period ranged from approximately $4,500 to $11,500 with an average per month of $7,924. In contrast to the parties’ assumption in drafting §4(b)(ii), the electricity cost for the subsequent months when both Diamond Crystal and Backleaf occupied the building ranged from approximately $2,200 to $4,800 with an average per month of approximately $2,500. For the approximately seven months during which both Diamond Crystal and Backleaf occupied the building, Diamond Ciystal paid Backleaf (under protest) approximately $41,000. The actual electricity costs during this time totaled approximately $18,000.1 specifically find that never was such a windfall to the landlord intended or bargained for by the parties.
CONCLUSIONS OF LAW
The purpose of an action for a declaratory judgment is “to remove, and to afford relief from, uncertainty and insecurity with respect to rights, duties, status and other legal relations.” Massachusetts G.L.c. 231A, §9. The provision is to be liberally construed and administered. See id.
In construing a lease, all provisions should be read together and the language should be given a reasonable meaning. See Ryan v. Boston Housing Authority, 322 Mass. 299, 302 (1948). “(T]he construction of a lease depends upon the intention of the parties to be ascertained by considering all of its terms, giving to the words used the natural and reasonable meaning in the light of the facts to which they apply and the circumstances in which they are used.” Wunsch v. Donnelly, 302 Mass. 286, 289 (1939). The court should, in interpreting a contract, avoid if possible an unjust and unreasonable result. See Markus v. Boston Edison Company, 317 Mass. 1, 6 (1944). “The construction of a written instrument to be adopted is the one which appears to be in accord with justice and common sense and the probable intention of the parties. It is to be interpreted as a business transaction entered into by practical men to accomplish an honest and straightforward end.” Clark v. State Street Trust Co., 270 Mass. 140, 153 (1930). A contract may not be rewritten to “cure an oversight or relieve a party from the consequences of the failure to adhere to its plain terms.” National Medical Care, Inc. v. Zigelbaum, 18 Mass.App.Ct. 570, 576 (1984).
Although extrinsic evidence may not be admitted to contradict a clear contract provision, extrinsic evidence is admissible “(w]hen the written agreement. . . is in any respect uncertain or equivocal in meaning.” Keating v. Stadium Management Corp., 24 Mass.App.Ct. 246, 249 (1987) (internal quotation marks omitted). “[A]ll the circumstances of the parties leading to [a contract’s] execution may be shown for the purpose of elucidating, but not of contradicting or changing its terms ... Expressions in our cases to the effect that evidence of circumstances can be admitted only after an ambiguity has been found on the face of the written instrument have reference to evidence offered to contradict the written terms.” Id. at 249-50 (quoting Robert Industries, Inc. v. Spence, 362 Mass. 751, 753-54 (1973); see also Keating v. Stadium Management Corp., 24 Mass.App.Ct. at 250 (“The facts and circumstances of the transaction . . . may be admitted for the purpose of applying the terms of the written contract to the subject matter and removing and explaining any uncertainty or ambiguity which arose from such application” (internal quotation and alteration marks omitted)). Where there is no ambiguity, a contract must be enforced according to its terms. See, e.g., Freelander v. G.&K Realty Corp., 357 Mass. 512, 516 (1970); see also Sherman v. Employers’ Liability Assur. Corp., Ltd., 343 Mass. 354, 356 (1961) (“When . . . the words are plain and free from ambiguity they must be construed in their usual and ordinary sense”). Applying these principles to the instant case, this Court finds that the contractual provision at issue is ambiguous, and that the parties, in drafting the provision, intended it to require Diamond Crystal to pay for as close an approximation as possible to its share of the actual electricity costs.
*585 The provision at issue states that Diamond Crystal's share of electricity is to be based on its historical costs of electricity during the Diamond Crystal sole occupancy period. The term “based on" in this Court’s view is ambiguous. A basis is a foundation or a starting point. It is not the final answer; rather it provides an initial figure from which the amount to be paid should be determined. Had the parties intended Diamond Crystal to pay a figure equal to the average of the costs over the Diamond Crystal sole occupancy period, the contract could easily have included such a provision. Instead, the parties selected “based on,” the more amorphous language. The credible testimony proffered at trial indicates that a fixed figure was not the intent of the parties. Rather, the parties sought a proxy for the actual cost of the electricity used by Diamond Crystal and intended that Section 4(b)(ii) permit the parties to charge a figure as close to that actual cost as determinable. Given this objective, a finding that Diamond Crystal should be required to pay a sum nearly three times the actual cost of the electricity for the entire building would be contrary to both the parties’ intent and the language of the contract.
This Court recognizes the difficulty that was faced by the parties. There continues to be a single meter at the building, and it continues to be impossible to determine the amount or cost of the electricity used by Diamond Crystal. In light of this obstacle, this Court believes it is appropriate for the parties to themselves decide on the share of the total cost of electricity to be paid by Diamond Crystal. However, in no event should Diamond Crystal pay more than the cost of the actual electricity bill for the entire building.
Accordingly, this Court hereby declares under the terms of the contract that Diamond Crystal is not required to pay any sum in excess of the actual cost of electricity for the entire building. The actual sum owed by Diamond Crystal, that is its share of the electricity costs while Backleaf also occupied the building, is to be determined by the parties.
ORDER
Based on the foregoing, it is hereby ORDERED that a declaration enter declaring that under the terms of the contract between the parties, Diamond Crystal is not required to pay any sum in excess of the actual cost of electricity for the entire building. The actual sum owed by Diamond Crystal, that is its share of the electricity costs while Backleaf also occupied the building, is to be determined by the parties. Plaintiffs 93A claim is denied. Defendant’s counterclaim is denied.