GERMANIA M. JENSEN, executrix,[1] *vs.* WILLIAM M. DANIELS
& others.[2]

No. 00-P-566.

Barnstable. May 13, 2002. - April 23, 2003.

Present: KANTROWITZ, KASS, & McHUGH, JJ.

*Probate Court,* Judgment. *Practice, Civil,* Judgment, Failure to raise issue, Continuance. *Undue Influence. Evidence,* Privileged communication. *Privileged Communication.*

In a civil action by an executrix to recover money that one of the defendants had withdrawn from joint bank accounts that he had held with the decedent, that defendant was not unfairly surprised by the judge's finding that the defendant's name was on the disputed accounts simply for convenience, where the record revealed that the defendant was fully aware of the issue's presence and actually dealt with it at various times, and therefore, the issue was tried by implied consent notwithstanding the plaintiff's silence on the issue in her pleadings; however, where the complaint alleged simply that a second defendant had used undue influence to extract a check from the decedent, and the judge found that the second defendant had not exerted such undue influence, neither the pleadings nor anything else gave that defendant fair notice that the plaintiff was seeking restitution from her of the money withdrawn from the joint accounts by the first defendant under an "innocent recipient" theory, and therefore, there was no basis for a judgment against the second defendant. [814-818]
In a civil action, the judge did not err in prohibiting the defendant from testifying about the content of statements that the plaintiff's decedent had made to his attorney in the defendant's presence, where the defendant had been present in his capacity as the decedent's agent, and therefore, the attorney-client privilege applied to the communication. [818-819]
In a civil action, the judge did not abuse his discretion in declining to continue the case so that the defendant could procure and present to the court a certain witness's testimony, where the judge carefully considered the frail state of the witness's health, and where the areas in which the defendant sought to have the witness testify were of marginal utility or involved a facially inadmissible conclusion. [819]

CIVIL ACTION filed in the Barnstable Division of the Probate and Family Court Department on February 10, 1998.

[1]Of the estate of Maurice H. Lopes.
[2]Olivia Daniels and Cape Cod Five Cents Savings Bank, trustee process defendant.

The case was heard by *Robert E. Terry*, J., and a motion for a new trial was also heard by him.

*James B. Krasnoo* (*Paul J. Klehm* with him) for William M. Daniels & another.

*Michael A. Murphy* for the plaintiff.

McHUGH, J. Within days of Maurice Lopes's death, his nephew, the defendant William Daniels (William), removed approximately $235,000 from four bank accounts then standing in their joint names. The plaintiff, Germania Jensen, Lopes's sister and the executrix of his estate, commenced an action against William and his wife, Olivia, in the Probate and Family Court in which she sought an order requiring William to turn over to the estate the funds he had taken from the accounts.[3] In addition, she sought an order requiring William and Olivia to turn over the proceeds of two $10,000 checks Lopes had given them before he died. After a bench trial, the judge ordered both William and Olivia to pay the estate the amount William had taken from the bank accounts but allowed them to keep the check proceeds. From that judgment, William and Olivia have appealed. We conclude that there was no basis for the judgment against Olivia but otherwise affirm.

The unchallenged findings of fact material to appellate issues begin with Lopes's death from congestive heart failure on November 30, 1996, at the age of seventy-eight. In September of 1974, a little over twenty-two years earlier, Lopes had made a will in which he left all of his property to his two sisters, the plaintiff and Theodora Daniels, William's mother. The record does not disclose the nature of Lopes's assets at the time he made his will. About two years later, however, his mother conveyed to him the Provincetown house in which he and his two sisters had been born and raised. Lopes subsequently lived in the house until May, 1996,[4] and it was by then one of his principal assets.[5]

---

[3]The action was a component of the proceedings for the probate of Lopes's will. See note 18, *infra*.

[4]The record reflects that Lopes also spent a substantial amount of time in Florida. See note 18, *infra*.

[5]Lopes's other principal asset was an interest in a mutual fund he had inherited from a family friend. After 1987, he and the plaintiff were joint owners of that interest. During Lopes's life, the fund was used, at least from time

By May of 1996, Lopes was afflicted with an array of ailments and was gravely ill. Toward the end of that month, with the advice and assistance of his own attorney,[6] he sold the house for $235,000 and began living with William and Olivia at their home in Mashpee. From the sale proceeds, he gave William a check for $10,000 and gave Olivia a check in like amount. Then, with William's assistance, he opened two accounts (Cape Cod accounts), one at the Cape Cod Bank and Trust Company and the other at the Cape Cod Five Cents Savings Bank. He opened each account in his name and William's and, in each, he deposited $94,986.99 from the sale proceeds. Although William had been a frequent customer of both banks, Lopes had never before done business with either.

At the time Lopes opened the Cape Cod accounts, he had two additional accounts in his own name at Fleet Bank.[7] One was a checking account holding approximately $9,800 and the other was a money market account that ultimately held approximately $39,000.[8] Lopes's monthly Social Security checks were routinely deposited in the checking account and he generally used that account for living expenses. About the time William assisted Lopes in opening the Cape Cod accounts, Lopes added William's name to the two Fleet accounts.

Within days of Lopes's death on November 30, 1996, William had extracted all of the money from the Cape Cod Five Cents Savings Bank account and from the Fleet Bank money market account. By February 24, 1997, William had taken all of the money from the other two accounts and had closed all four. The money William took from the four accounts totaled $238,538.16, and he used it for such things as enhancing his

---

to time, for Lopes's living expenses. When he died, the value of the interest approximated $171,000. The plaintiff did not treat the fund as part of Lopes's estate but her choice not to do so is not at issue in this litigation.

[6]The attorney also died before trial.

[7]A third stood in his name and the plaintiff's. That account does not figure in this litigation.

[8]Although the findings are not clear on the point, it appears that Lopes deposited in this account the approximately $25,000 balance of the sale proceeds remaining after he opened the Cape Cod accounts.

retirement account, paying portions of a mortgage loan, and buying a new car.

In the complaint she filed to obtain return of Lopes's money, the plaintiff contended that William had used undue influence on the ailing Lopes in order to get him to deposit substantial portions of the sale proceeds in the joint Cape Cod accounts and to place William's name on the accounts at the Fleet bank. She also claimed that William and Olivia obtained the $10,000 checks through undue influence. William responded by asserting that Lopes wanted him to have the money and, for that reason, had placed his name on all four accounts. He and Olivia maintained that the checks were gifts Lopes had given them with a full understanding of what he was doing and an unencumbered intention to do so.

The judge found that none of Lopes's actions was the product of undue influence.[9] The checks, he concluded, were gifts Lopes freely and knowingly intended to make. The judge rejected, however, William's contention that Lopes wanted him to have the money in the four bank accounts. Instead, in findings that are challenged for reasons that will soon appear, he found that Lopes wanted his sisters to have the money in those accounts, had opened the two Cape Cod accounts to "protect" them for "FDIC purposes,"[10] and had placed all four accounts in his name and William's simply as a matter of convenience. See, e.g., *Burns* v. *Paquin*, 345 Mass. 329, 331 (1963). On that basis, the judge ordered William and Olivia to turn over to the estate the $238,538.16 William had removed from the accounts.

1. *Unfair surprise.* On this appeal, William and Olivia first claim that they were prejudicially surprised by two aspects of the judge's decision. The first is the judge's finding that William's name was on the disputed accounts simply for convenience. William and Olivia assert that the convenience

---

[9]Although she has not filed a cross appeal, the plaintiff's brief appears to argue that this finding was clearly erroneous. Without a cross appeal, however, the plaintiff cannot seek relief from it. See *Superintendent of Pub. Works of Attleboro* v. *Attleboro Contributory Retirement Bd.*, 38 Mass. App. Ct. 130, 132 n.6 (1995).

[10]Presumably, the judge was referring to Federal Deposit Insurance Corporation insurance on certain deposits in the amount of $100,000 or less. See 12 U.S.C. § 1821(a)(1) (2001).

theory had been neither pleaded nor otherwise injected into the case at any time before the judgment. "Undue influence," they contend, was the only theory of recovery the plaintiff had advanced. The second allegedly surprising aspect of the judgment was the requirement that Olivia turn over to the estate all of the funds William had removed. William and Olivia contend that the plaintiff only sought to recover from Olivia the proceeds of the $10,000 check. Never, they claim, had anyone asserted under any theory that Olivia was liable for the full amount William had withdrawn from the four accounts.

Neither the convenience theory nor an assertion that Olivia was liable for the full amount of William's withdrawals appears in the pleadings, the usual place where one looks for notice of the claims the litigation entails. See *Berish* v. *Bornstein*, 437 Mass. 252, 269 (2002). See generally *Conley* v. *Gibson*, 355 U.S. 41, 45-46 (1957).[11] If not remedied, such an omission is serious, for timely notice of the claims one faces is an essential ingredient of the fairness due process requires. See *Jimenez* v. *Tuna Vessel "Granada,"* 652 F.2d 415, 422 (5th Cir. 1981). See also *National Med. Care, Inc.* v. *Zigelbaum*, 18 Mass. App. Ct. 570, 578-579 (1984); *Messina* v. *Scheft*, 20 Mass. App. Ct. 945, 946 (1985). But notice in fact, and not notice delivered in a particular fashion or in a particular place, is ultimately what counts. See generally *Clark* v. *Greenhalge*, 411 Mass. 410, 413 n.6 (1991); *Ciccone* v. *Smith*, 3 Mass. App. Ct. 733, 734 (1975); *Wolfe* v. *Ford Motor Co.*, 6 Mass. App. Ct. 346, 354-355 (1978); Smith & Zobel, Rules Practice § 15.7 (1974).

In many cases, the record may not clearly reveal whether and how notice of an unpleaded issue was delivered. But, in an adversary system, the parties themselves are in the best position to determine whether they received sufficient notice of an issue. Therefore, even on an opaque record, we view a party's consent

---

[11]The required notice need not be detailed. Indeed, the complaint need not even "state the correct substantive theory of the case." *Gallant* v. *Worcester*, 383 Mass. 707, 709 (1981). See *Pentecost* v. *Spencer*, 29 Mass. App. Ct. 991, 993 (1990). A "short and plain statement . . . showing that the pleader is entitled to relief," Mass.R.Civ.P. 8(a), 365 Mass. 749 (1974), and an equally succinct response, Mass.R.Civ.P. 8(b), are entirely sufficient. Thereafter, discovery supplies the requisite detail. See *Cronin* v. *Strayer*, 392 Mass. 525, 534 (1984).

to trial of an unpleaded issue as a sure indication that the consenting party had sufficient notice of it. Consequently, when "issues not raised by the pleadings are tried by express or implied consent of the parties, [we treat them] in all respects as if they have been raised in the pleadings." Mass.R.Civ.P. 15(b), 365 Mass. 761 (1974).[12]

Express consent is easy to see. Detection of implied consent is often more difficult. Because of the nexus between consent and a proceeding's fundamental fairness, careful examination of the entire record is required before one reaches a conclusion that an issue was tried by implied consent.[13] Moreover, to warrant such a conclusion, the record must, at a minimum, show that the parties knew the evidence bearing on the unpleaded issue was in fact aimed at that issue and not some other issue the case involved. *Harrington-McGill* v. *Old Mother Hubbard Dog Food Co.*, 22 Mass. App. Ct. 966, 968 (1986). See *National Med. Care, Inc.* v. *Zigelbaum*, 18 Mass. App. Ct. at 579; *Mauser* v. *Raytheon Co. Pension Plan for Salaried Employees*, 239 F.3d 51, 58 (1st Cir. 2001).

a. *Convenience theory.* Insofar as the "convenience" theory is concerned, the record meets that test, for it reveals that the defendants were fully aware of the issue's presence and actually dealt with it at various times. True, the plaintiff's counsel stated in the opening statement that the case simply involved "undue influence."[14] When the plaintiff called William as her first witness, however, counsel examined William at some length about

---

[12]In such cases, the pleadings may, but need not, be amended to reflect omitted issues. Mass.R.Civ.P. 15(b).

[13]In cases where a judge concludes that an issue not tried even by implied consent may be dispositive of a case or where a judge is in doubt about whether an unpleaded issue is being consensually tried, "he should 'notify counsel of his concerns and permit counsel to present evidence on the question which the judge perceives to be dispositive.' " *Harrington-McGill* v. *Old Mother Hubbard Dog Food Co.*, 22 Mass. App. Ct. 966, 968-969 (1986), quoting from *National Med. Care, Inc.* v. *Zigelbaum*, 18 Mass. App. Ct. at 579.

[14]The plaintiff's counsel began his opening statement as follows:

"Your Honor, this is a very — what I consider to be a simple case of undue influence in the sale of [the Provincetown house] and the subsequent opening of two joint bank accounts in that same month in the name of [Lopes and William]."

whether the Cape Cod accounts had been opened for Lopes's convenience. At the close of the plaintiff's case, the defendant moved for dismissal of all claims, see Mass.R.Civ.P. 41(b)(2), 365 Mass. 804 (1974), and argued, in part, that although a claim of "convenience" could be made with respect to one checking account, the evidence would not support a conclusion that "convenience" was a motivating force in creating or changing the others.

After the judge denied the dismissal motion, the plaintiff pressed the convenience issue in cross-examining one of William's business associates and a Cape Cod Bank and Trust officer whom William had called. Then, in his direct examination of an officer of Fleet Bank, William and Olivia's counsel inquired whether the names on the Fleet Bank accounts had been changed to include William so that William would be able to pay Lopes's bills if anything happened to Lopes, a line of questioning the plaintiff's counsel then pursued in what was essentially friendly, or constructive, cross-examination.

Neither side presented a summation when the evidence concluded, but both sides submitted requests for findings of fact and conclusions of law. In his submission, the counsel for William and Olivia said the plaintiff had a right to submit evidence dealing with "convenience" but that the court should not be persuaded by it. The plaintiff specifically sought a finding that the accounts were created for Lopes's convenience. In a post-judgment motion for a new trial, William and Olivia urged that the evidence did not support a finding of convenience but they did not claim that convenience was an issue foreign to the case. Indeed, the record does not reflect any motion filed in the trial court claiming that convenience had not been a part of the case the parties tried.

Under those circumstances, we are persuaded that the issue of "convenience" was tried by implied consent notwithstanding the pleadings' silence on the issue.[15] We cannot, however, reach the same conclusion regarding the judgment against Olivia.

[15]We reject William's contention that, even if one assumes that the issue of convenience was present in the litigation, the judge's conclusion that the accounts had been set up for Lopes's convenience was so strongly against the

b. *Judgment against Olivia.* As mentioned earlier, the complaint simply alleged that Olivia had used undue influence to extract a $10,000 check from Lopes and sought delivery to the estate of that check's proceeds. The judge found, however, that Olivia had not exerted any undue influence over Lopes. Olivia was not listed on any of the disputed bank accounts, nor was there any finding that she had participated in their creation. There was testimony to the effect that Olivia had received some of the benefit of the funds William removed from the accounts after Lopes's death, but the judge made no findings of fact regarding the nature of the benefit Olivia received or the circumstances under which she received it.

Insofar as Olivia was concerned, then, the findings of fact simply stated that she had not unduly influenced Lopes, i.e., that she was innocent of any wrongdoing. There are, to be sure, circumstances under which the innocent recipient of money, or goods the money bought, may be required to make restitution to the person from whom the money was wrongfully obtained. See *Jones* v. *Swift*, 300 Mass. 177, 185 (1938); *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 544 (1997). But neither the pleadings nor anything else gave Olivia fair notice that the plaintiff was seeking restitution from her under an "innocent recipient" theory, and the judge's findings of fact provide no foundation for entry of judgment against her on such a theory. Under those circumstances, there simply was no basis for the judgment against Olivia. See, e.g., *Berish* v. *Bornstein*, 437 Mass. at 269; *Marshall* v. *Stratus Pharmaceuticals, Inc.*, 51 Mass. App. Ct. 667, 674-675 (2001).

2. *Other issues.* William's two final claims of error require far less time.

a. *Attorney-client privilege.* First, William contends that the judge erroneously prohibited him from testifying about the content of statements Lopes made to his attorney, in William's presence, regarding his intended disposition of the money in the bank accounts. The plaintiff objected to introduction of the

weight of the evidence that a new trial should be granted. New trial decisions are committed to the trial judge's broad discretion. See *International Totalizing Sys., Inc.* v. *PepsiCo, Inc.*, 29 Mass. App. Ct. 424, 438 (1990), and cases cited. We find no abuse of that broad discretion here.

testimony on grounds of the attorney-client privilege. See gener-
ally *Matter of a John Doe Grand Jury Investigation*, 408 Mass.
480, 481-484 (1990). William responded by asserting that his
presence destroyed the privilege. But the judge sustained the
objection after William's attorney agreed in an ensuing colloquy
that William had been present in his capacity as Lopes's agent.[16]
There was no error. See *Foster* v. *Hall*, 12 Pick. 89, 93 (1831);
*Ellingsgard* v. *Silver*, 352 Mass. 34, 40 (1967); Proposed Mass.
R.Evid. 502 (privilege applies to communications with a
"representative of the client" and defines the quoted term to
mean a person who has the authority "to act on [legal]
advice . . . on behalf of the client").

b. *Continuance.* Finally, William maintains that the judge er-
roneously declined to continue the case so that William could
procure and present to the court his mother's testimony. Whether
to continue a case so that additional testimony can be procured
is a decision resting in the trial judge's sound discretion. See,
e.g., *Mowat* v. *Deluca*, 330 Mass. 711, 712 (1953); *Homsi* v.
*C.H. Babb Co.*, 10 Mass. App. Ct. 474, 475-476 (1980); *Care
and Protection of Quinn*, 54 Mass. App. Ct. 117, 120 (2002).
The record shows that the judge carefully considered the frail
state of the mother's health, which appeared to require special
accommodation to obtain her testimony. More importantly, Wil-
liam listed for the judge the five areas in which he sought to
have the mother testify. Four were of marginal utility. The fifth
was that "the money [in the joint bank accounts] was supposed
to go to" William, but William's attorney specified none of the
evidence the mother would present in support of that facially
inadmissible conclusion. Under those circumstances, there was
no abuse of discretion in declining to grant the continuance.[17]

In light of the foregoing, that portion of the judgment requir-

---

[16]Here, William again acknowledges that he was an agent for Lopes but
claims that the conversation went beyond the agency's scope. At trial, though,
William made no argument regarding the scope of the agency. The point,
therefore, does not survive. See, e.g., *Bercume* v. *Bercume*, 428 Mass. 635,
642 (1999); *Demoulas* v. *Demoulas*, 432 Mass. 43, 65 (2000).

[17]Even if one views the judge's order simply as one that excludes proffered
testimony, there was no error. A judge has discretion to exclude even relevant
testimony if, among other things, the testimony is needlessly cumulative.
Proposed Mass.R.Evid. 403. An exercise of such discretion will be reversed
only if the exercise amounts to "palpable error." *Boston* v. *United States*

ing Olivia Daniels to pay the estate of Maurice H. Lopes the sum of $238,538.16 plus interest and ordering the attachment of Olivia Daniels's interest in Barnstable County real estate is reversed. In all other respects, the judgment is affirmed, as is the denial of the motion for a new trial.[18]

*So ordered.*

---

*Gypsum Co.*, 37 Mass. App. Ct. 253, 261 (1994). The record reflects no such error here.

[18]As a final note, the defendants filed in this court, almost two years after the case was entered here and four years after the plaintiff filed her action in the Probate Court, a motion, supported by extensive affidavits, to vacate the judgment and dismiss the action on grounds that, because Lopes was a Florida domiciliary at the time of his death, see note 4, *supra*, the court lacked subject matter jurisdiction over his estate. See G. L. c. 215, § 3; *Connolly* v. *Phipps*, 283 Mass. 584, 586 (1933). Lack of subject matter jurisdiction may be raised at any time, even though waiting until now to do so may pose a number of practical problems. See, e.g., *Bernier* v. *DuPont*, 47 Mass. App. Ct. 570, 576-577 (1999); *McCracken* v. *Sears, Roebuck & Co.*, 51 Mass. App. Ct. 184, 187-189 (2001). Nevertheless, even assuming that Lopes was a Florida domiciliary and that the jurisdictional argument is applicable to these asset-marshaling proceedings, neither of which issues we decide, dismissal is unwarranted. The defendants concede that, at the very least, ancillary jurisdiction in Massachusetts is proper. See *Rackemann* v. *Taylor*, 204 Mass. 394, 397-398 (1910); *Kaltsas* v. *Kaltsas*, 22 Mass. App. Ct. 689, 690 (1986). Although the statutes governing ancillary administration suggest that the will in question should be proved and allowed in the foreign jurisdiction before ancillary proceedings begin here, see G. L. c. 192, §§ 9-11, the statutes do not prohibit one from undertaking the ancillary proceedings first. See *Bowdoin* v. *Holland*, 10 Cush. 17, 21 (1852) (interpreting Rev. Sts. 1836, c. 62, §§ 17-20, the essence of which survive today in G. L. c. 192, §§ 9-11).